UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| ROBERT GOGUEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:12-cv-00048-JAW |
| | ) | |
| | ) | |
| JENNIFER GILBLAIR, et als., | ) | |
| | ) | |
| Defendants | ) | |

## ORDER ON MOTION TO AMEND
## AND
## RECOMMENDED DECISION

Between March and December 2011, Robert Goguen was detained at the Somerset

County Jail awaiting the resolution of pending charges in state and federal courts.  (See United

States v. Goguen, 1:11-cr-00003-JAW.)  In this action he claims that personnel at the Somerset

County Jail violated his constitutional rights in divers ways.  The defendants timely filed a

motion seeking judgment on the pleadings or summary judgment.  Their motion targets every

claim.  In his timely response to the motion, Goguen has included an untimely motion for

judgment on his own behalf.  Upon review of the defendants' reply, Goguen also filed a motion

to amend his summary judgment response.  The court referred the pending motions.  Goguen's

motion to amend (ECF No. 62) is denied.  For reasons that follow, I recommend that the court

deny Goguen's cross-motion for summary judgment (ECF No. 55) and grant in part and deny in

part the defendants' motion for judgment (ECF No. 44).

### PROCEDURAL BACKGROUND

On February 6, 2012, Goguen commenced this civil action against multiple Somerset

County corrections officers.  Goguen's operative pleading, his second amended complaint, is a

58-page document that requests varying injunctive relief and compensatory and punitive

damages.  (ECF No. 24.)  On October 22, 2012, the defendants filed a dispositive motion

requesting that judgment enter against some claims based on the inadequacy of the pleadings and

otherwise requesting the entry of summary judgment against all claims.  (Motion for Judgment

on the Pleadings and for Summary Judgment ("Motion"), ECF No. 44.)  On March 15, 2013,

Goguen filed his opposition papers, including in his memorandum a cross motion for summary

judgment in his favor.  (Cross Motion for Summary Judgment ("Cross-Motion"), ECF No. 55.)

Then, when the summary judgment briefing appeared to be complete, Goguen filed a motion to

amend his response to the defendants' motion for summary judgment.  (Motion to Amend

Response, ECF No. 62.)  On April 9, 2013, upon completion of the initial briefing cycle, the

court referred the motions for judgment.  The court referred Goguen's request for leave to amend

on June 5, 2013.

## THE CLAIMS

Goguen's claims are many and varied.  His amended complaint concludes with a

recitation of sixteen claims, some overlapping, each of which is asserted against a particular

grouping of the sixteen defendants.  (Second Amended Complaint ¶¶ 321-336.)  Some of

Goguen's claims fall under the Fourteenth Amendment's due process prohibition against

imposing "punishment" on pretrial detainees without the benefit of predeprivation process.

Some identify other constitutional provisions including the Fourth Amendment's prohibition

against unreasonable searches and seizures, the First Amendment's Petition Clause and its

corresponding prohibition against retaliation for petitioning government in redress of grievances,

the Sixth Amendment's guarantee of access to counsel, and the Eighth Amendment's Cruel and

Unusual Punishments Clause.  Because Goguen is suing state actors all of his claims arise under 42 U.S.C. § 1983 and concern fourteenth amendment rights.

FACTS

By local rule, summary judgment facts are introduced by means of "a separate, short, and concise statement of material facts," which statement must be supported by record citations.  D. Me. Loc. R. 56(b), (c).  The court's review of the record is guided by the moving party's statement, the non-moving party's opposing statement, including any additional statement, and the moving party's limited reply statement.  D. Me. Loc. R. 56(b), (c), (d).  Here, the defendants filed a statement of material facts in support of their motion for summary judgment. ("Statement," ECF No. 45.)  Goguen then filed an opposition to the defendants' statement. ("Opposing Statement," ECF No. 56.)  However, Goguen's statement does not conform to Local Rule 56 because, among other things, most of his statements do not conclude with record citations in support of Goguen's version of events.  The same is true of Goguen's statement of additional material facts.  ("Additional Statement," ECF No. 56-1.)  Moreover, Goguen presents the vast majority of his factual assertions (and there are many) in his opposition memorandum rather than in his opposing statement and additional statement.  On top of this, none of Goguen's pleadings is sworn.  The only sworn statements by Goguen that are of record are found in his deposition testimony, which Goguen does not reference in his summary judgment papers but which the defendants do.

In the context of prisoner litigation in this district, special care must be taken with a prisoner's pro se filings in opposition to a motion for summary judgment.  This court has observed that a prisoner's nonconforming summary judgment submission should be reviewed by the court and that facts set forth in a verified complaint or prisoner affidavit should be considered

3

when examining the entire summary judgment record.  Clarke v. Blais, 473 F. Supp. 2d 124, 128 (D. Me. 2007);  See also Demmons v. Tritch, 484 F. Supp. 2d 177, 182-83 (D. Me. 2007) (discussing pro se prisoners and motions for summary judgment).  Here, there is no affidavit and no verified complaint, though Goguen has supplied the court with multiple exhibits as attachments to his filings (mostly grievance- and discipline-related paperwork and prison policies).  In some instances Goguen directly cites exhibits in support of statements found in his separate opposition memorandum ("Opposition Memorandum," ECF No. 54) as well as in his opposing statement and additional statement.  These citations have not been ignored.

In their reply statement, the defendants request that Goguen's unsupported statements be stricken.  (Reply Statement, ECF No. 59.)  They also request that fact statements accompanied by citations be carefully scrutinized to ensure that no statements are credited to the extent they are not supported by the citation offered.  (Id. ¶¶ 3-12.)  In response, Goguen filed a motion requesting leave to amend his response to the defendants' summary judgment motion and statement of material facts.  (Motion to Amend Response, ECF No. 62.)  He proposes that he be permitted to correct his submissions by adding record citations, but notes that he did provide some citations in his responses, just not in his "fact section."  (Id. at 1.)  Goguen's motion to amend is denied because Goguen's motion to amend does not attach any proposed, amended filings and it would be unfair to expect the defendants to expend more time and money replying to essentially a new response to their original motions filed on October 22, 2012.  Goguen has already requested and obtained repeated extensions while formulating his response.

Notwithstanding the foregoing, as the non-moving party Goguen is entitled to have the summary judgment facts considered in the light most favorable to his cause.  Wilson v. Moulison N. Corp., 639 F.3d 1, 6 (1st Cir. 2011).  To the extent the available statements and citations

4

permit reasonable inferences in Goguen's favor, those inferences will be credited.  Finally,
Goguen's deposition transcript is available for consideration.  Goguen has articulated the facts,
as he maintains they were, quite thoroughly.  Many of the statements found in his statements and
memoranda are "personal knowledge" statements, though they are insufficient for summary
judgment purposes because Goguen has not sworn to them.  I have looked to Goguen's
deposition to determine whether he has offered any sworn testimony to support his unsworn
factual assertions.

**Fact Summary**

The summary judgment facts constructed from a review of the parties' summary
judgment papers fill roughly 20 pages.  Distilled to the essence, the material facts reflect that
Goguen spent a fair amount of his time in pretrial detention focused on critically evaluating the
Somerset County Jail's practices and procedures during his sojourn there.  During his stay,
Goguen did not hesitate to file internal grievances and took issue with a variety of jail policies,
practices, and procedures;  with how well staff followed policy and procedure;  and with what he
regarded as heavy-handed and retaliatory treatment.  His efforts have yielded a significant
amount of grievance-related paperwork, not all of which is described in this recommended
decision.  What the following recitation of the facts reflects, ultimately, is that a reasonable jury
could conclude that Somerset County Jail personnel have a practice of using "administrative
segregation" in a punitive fashion and that this practice deprives pretrial detainees of the right to
receive due process before being subjected to prison disciplinary sanctions.  Such a finding
would be based, in part, on the imposition of segregated confinement immediately following the
presentation of a disciplinary charge, with no more process than the presentation to the detainee
of a written notice naming the charge.  Although segregated confinement alone would not

warrant a jury verdict that "punishment" was imposed on Goguen, the jury could also find that the conditions of segregated confinement at the Somerset County Jail are, in fact, punitive, based in part on the programmatic use of strip and visual body cavity searches every time the segregated detainee crosses the threshold of his cell, whether to shower, to recreate alone in a recreation cell, to make a phone call, or to accommodate the mandatory daily search of his cell. These strip and visual body cavity searches occur even in the absence of contact with other prisoners or with people from outside the facility.  In Goguen's case, these conditions were imposed for more than a week while Goguen waited for the jail's due process proceedings to gradually unfold.  In some cases, this happened to Goguen even though the underlying disciplinary charges were not deemed worthy of being punished with anything on par with disciplinary segregation.  In effect, the finding would be that Goguen was repeatedly subjected to immediate prison punishment for various disciplinary charges without the benefit of meaningful predeprivation due process.

In addition to these facts, the record also invites the finding that Goguen's demands for procedural due process (and other petition activity pursued both inside the jail and in this courthouse) negatively impacted the treatment he received from corrections staff.  For example, after enduring repeated placement in administrative segregation followed by modest actual sanctions, staff began to pursue the idea of imposing a maximum security classification on Goguen, initially extending his stay in administrative segregation while the issue was being considered and later imposing the maximum security classification with a hearing to follow. While subject to maximum security during his final weeks at the Jail, Goguen was subjected to placement in four-point restraints whenever he sought to access the Jail's library cart, which, according to Goguen, prevented him from making meaningful use of the cart and its legal

materials.  In addition to contributing to Goguen's due process claim, these facts and

circumstances raise a genuine issue whether the treatment was retaliation for persistent petition

activity.

**Parties**

Robert Goguen was a pretrial detainee at Somerset County Jail between March 14, 2011,

and December 13, 2011.  (Statement ¶¶ 1-2.)[1]  In his action he names multiple defendants, all of

whom were employed with the Somerset County Jail during Goguen's stay there.  In alphabetical

order by last name, the defendants are:

Allen, David, jail administrator;

Almeida, Jessica, corrections officer;

Brown, Teresa, classifications supervisor;

Bugbee, Darlene, lieutenant;

Crafts, Gary, special projects officer;

French, James, corrections officer;

Gilblair, Jennifer, corrections officer;

Hayden, Julie, corrections officer;

Jacques, Eddie, corrections officer;

Jacques, Jeffrey, lieutenant as of August 2011;

Kelly, Margaret, corrections officer;

Maguire, Shawn, compliance manager;

Meunier, Craig, corrections officer;

Plourd, Keith, lieutenant from a "recent" promotion;

Rizzo, Michael, corrections officer; and

---

[1]     Goguen offers no objections to the defendants' statements describing the parties.

Swope, Cory, assistant jail administrator.

(Id. ¶¶ 3-18.)

## Administrative Segregation

From March 15, 2011, until June 23, 2011, Goguen was housed in E-pod. E-pod is considered a general population area in the jail. It is a "transitionary" pod that allows inmates more time out of the cell than A-pod. A-pod is the special management unit where inmates on administrative segregation ("Ad-Seg") and disciplinary segregation are housed, in addition to inmates who are classified as maximum security. (Id. ¶¶ 118-119, 121.)

According to jail policy, an inmate may be sent to administrative segregation when, among other things, his continued presence poses a "serious threat" to safety, security, or order. (SJC Policy 7.2(A)(1), (B)(1), ECF No. 56-11 (Pl.'s Ex. Q) at 19.) When an inmate is taken to administrative segregation, all of the inmate's property is put into a bag and taken to the property room. Goguen disagrees, but says only that the belongings are to be brought to A-pod, where they are searched to remove items not allowed in A-pod. Goguen's qualification is consistent with the applicable policy. (SJC Policy 7.2(C)(3), ECF No. 56-11 at 20.) In administrative segregation an inmate is allowed to have legal materials, but no hardcover books. If an inmate in administrative segregation requests his legal materials, arrangements are made to return the legal materials to the inmate when the property officer is on duty. When an inmate is placed back in general population, the inmate's property is returned when the property officer is on duty. (Statement ¶¶ 164-167.)

Pursuant to jail policy, placement in administrative segregation is reviewed within seventy-two hours of the placement by the "classification supervisor." Also pursuant to policy, an inmate is given notice of the reason for the placement in administrative segregation within

seventy-two hours of the placement and is given the date and time the administrative segregation committee will hold a hearing to review the administrative segregation placement.  Another review of administrative segregation status is done within seven days (every Friday) to determine if continued placement is needed.  Goguen says that such a review can be performed by any day shift commander, which is accurate.  (SJC Policy 7.2(E);  Statement ¶¶ 168-170;  Opposing Statement ¶¶ 164, 166, 168.)

Inmates in administrative segregation are allowed out of their cells for one hour a day, five days a week for recreation.  Recreation for inmates in administrative segregation is in a caged area that is approximately five feet wide and ten feet long.  Inmates in administrative segregation are allowed out of the cell to take showers three times a week.  An inmate is generally allowed ten to fifteen minutes to shower.  Once per week inmates in administrative segregation are allowed out of their cells to make a phone call.  (Statement ¶¶ 171-174; Opposing Statement ¶ 170.)

**6/23/2011 Disciplinary Charges**

On June 23, 2011, Gilblair searched Goguen's cell for an envelope.  Gilblair asked Meunier to not let Goguen upstairs while she was searching the cell.  Goguen was allowed to watch the cell search from downstairs, though Goguen alleges that one cannot actually watch a cell search from downstairs.  This is a fair qualification based on photographic evidence of the E-pod.  (ECF No. 24-1 at 13.)  Gilblair's search turned up commissary items including one plastic soap dish, one bar of soap, one plastic bowl, one white-colored shower shaver, and one bottle of shampoo.  Goguen could not have purchased these items because he had no money since his incarceration.  On June 23, 2011, Gilblair wrote a disciplinary report and a notice of infraction for a violation of C-04, giving, receiving, swapping.  (Statement ¶¶ 19-24.)  Goguen's allegations

are that there was no suspicion to support the search because legal envelopes are supplied for free by the commissary.  (Opposition Memorandum at 19, ¶ 2.)

In addition to the giving/receiving/swapping infraction, Meunier wrote a disciplinary report on June 23, 2011, charging a violation of B-24, interfering, and B-12, provocation.  The charge was that Goguen argued and swore in response to the cell search.  (Statement ¶¶ 29-30.) Goguen alleges "retaliation" by Meunier and Gilblair.  (Opposing Statement at 1, ¶ 25.)  Goguen has testified that he did not act out while Gilblair searched his cell, but that Gilblair was yelling and cursing at him.  (Goguen Deposition at 48-49.)  He also testified that prior to June 23 he was a witness for another inmate and "wrote a report against Gilblair for her misconduct in the block or harassment."  (Id. at 47.)  This grievance is in the record and is dated June 18.  (Grievance Form, ECF No. 24-1, at 6.)  The record suggests an ongoing dispute over facility rules related to cleaning rooms.  (E.g., ECF No. 24-1 at 24.)

Non-defendant officer Ducharme was assigned to investigate the giving-receiving-swapping incident and spoke to Goguen on June 23, 2011.  Ducharme told Goguen what the alleged violation was about and asked for Goguen's side of the story.  (Statement ¶ 25.) Goguen's allegation is that SCJ officers never tell you the facts behind the charge, only what the charge is, and that their investigations are perfunctory, even though the jail's inmate discipline policy (Policy 10.1) calls for witness interviews.  (Opposition Memorandum at 12-13, ¶ 6; Opposing Statement at 1, ¶ 25.)  In any event, Ducharme gave Goguen a notice of infraction (ECF No. 45-17), which informed him of the charge and the date.  (Statement ¶¶ 26-27.) Goguen admitted that the items found in his cell were not issued to him, but were either left in the cell, given to him by another inmate, or left behind in the shower, and stated that he did not realize he could not have them.  (Id. ¶ 28.)  Officer French was assigned to investigate the

interfering-provocation charge and he supplied Goguen with a notice (ECF No. 45-19), informed Goguen of the charge, and asked for his side of the story.  (Statement ¶¶ 31-32.)

According to the notices, inmates are to receive an opportunity to respond or explain the alleged violation to a disciplinary hearing officer (DHO) within seven days and it is the DHO who both considers whether the inmate is guilty or not guilty and determines the sanction.  The notice promises a right to call witnesses and to question them, provided the witnesses are identified and the questions are vetted through the DHO prior to the hearing date.  (See, e.g., ECF No. 45-17.)

Notices and reports of this kind are forwarded to Gary Crafts, special projects officer, to review and determine whether the charges should be changed, dismissed, steered toward an informal resolution, referred for further investigation, or referred for disciplinary hearing.  On June 28, Crafts referred both matters for disciplinary hearing and set the hearing date at July 1, 2011.  (Statement ¶¶ 33-35.)  Goguen identified his witnesses by description and cell location, but not by name.  (Id. ¶ 38.)  Goguen did not put in writing what questions he wanted to be asked of any witnesses.  (Id. ¶ 39.)  All he has identified is a request form stating that he wanted to talk to Crafts about his write-ups.  (Goguen Ex. 4 at 1, ECF No. 56-3.)  The reasonable inference to be drawn from the facts is that neither Crafts nor the disciplinary hearing officer, Jeffrey Jacques, pursued any witness statements on Goguen's behalf, but Goguen has not established that he conformed to procedure to secure any witnesses in his behalf.  (Statement ¶¶ 36-44.)

At the July 1 hearing, Jacques heard Goguen's testimony, viewed still photos, reviewed the officers' incident reports, and found Goguen guilty of the giving/swapping/receiving charge, for which he received a verbal reprimand, and guilty of the interfering/provocation charges, for which he received a verbal reprimand and a $10 fine.  (Id. ¶¶ 41-46.)  Although found guilty of

both infractions, Jacques indicated in his reports that he assessed zero days of disciplinary segregation.  (ECF No. 45-18 at 5;  ECF No. 45-20 at 5.)  Goguen appealed the decision concerning interfering and provocation, but Allen affirmed the decision.  (Id. ¶ 48.)

Although the sanctions described above do not include disciplinary segregation, while this procedure was unfolding Goguen was rehoused in administrative segregation and remained there for roughly two weeks.  On June 23, 2011, Goguen was placed in administrative segregation and transferred to A-pod on order of Sergeant Plourd.  (ECF No. 24-1 at 1.)  Goguen remained in A-pod from June 23, 2011, until July 6, 2011.  Goguen maintains that some of his legal papers went missing as a result of the June 23 search and the transfer of his property to A-pod, though he has not identified a sworn statement to this effect.  (ECF No. 56-3 at 25-26.)

Goguen's placement in administrative segregation was reviewed by non-defendant Lt. Campbell on June 26, 2011, and Campbell determined that Goguen should remain on administrative segregation.  Goguen received notice of the decision to keep him on administrative segregation on June 26, 2011, and notice that his placement in administrative segregation would be reviewed on July 1, 2011.  (Statement ¶¶ 120, 122-124.)  On July 1, 2011, a hearing was held to review Goguen's administrative segregation status.  Lt. Bugbee was the hearing officer and Officer French and non-defendant Officer Welsh were committee members. Goguen attended and testified at the administrative segregation hearing on July 1, 2011.  The administrative segregation hearing committee determined that Goguen should remain on administrative segregation until a classification committee could do a review of Goguen's security status.  (Id. ¶¶ 125-127.)  This occurred despite the fact that on July 1 Jacques signed his reports imposing zero disciplinary segregation for the infractions in question.  (ECF No. 45-18 at 5;  ECF No. 45-20 at 5.)

On July 6, 2011, another administrative segregation hearing occurred.  This time Lt. Bugbee was the hearing officer and Sgt. Plourd and Officer Meunier were committee members. Goguen attended and testified.  The administrative hearing committee determined that Goguen should be removed from administrative segregation because classification had reviewed Goguen's status and determined that Goguen was still a medium security inmate.   Goguen was released from administrative segregation on July 6, 2011.  On July 6, 2011, Goguen was returned to E-pod where he remained until he was transported to the Penobscot County Jail on July 10, 2011.  (Statement ¶¶ 128-132.)

**7/15/2011 Disciplinary Charge (bunk assignment)**

On July 15, 2011, during cell reassignments, Goguen was assigned an upper bunk and told the officer on hand, Rizzo, that he needed a lower bunk assignment.  Rizzo called the medical department and learned that Goguen did not have a bottom bunk restriction.  According to the defendants, Rizzo ordered Goguen to move to the upper bunk, but Goguen refused; Goguen then told Rizzo to send him to A-pod, which Rizzo did.  Rizzo wrote a disciplinary report and a notice of infraction for a violation of B-11, refusing to obey an order, because of Goguen's refusal to move to an upper bunk.  Officer Edward Jacques investigated the incident and spoke to Goguen.  Goguen admitted that he refused the order to go to an upper bunk, that he said if he did not get a lower bunk he would go to A-pod, and that he did not have a medical slip for a lower bunk restriction.  This infraction would eventually be dismissed, but Goguen would remain in A-pod until July 28 because of it.  (Statement ¶¶ 49-56, 135, 142;  ECF No. 56-3 at 13-16.)  In his deposition testimony, Goguen denies ever being ordered to take an upper bunk.  He testified that there was no order and that Rizzo "slammed" him against the wall, handcuffed him,

and escorted him to A-pod after calling and finding out that Goguen had no medical restriction for a lower bunk. (Goguen Deposition at 58-59.)

The defendants' version, on the other hand, is that Goguen was placed in administrative segregation and transferred to A-pod by Bugbee for disrupting the pod during cell moves and arguing with the pod officer. Goguen's placement in administrative segregation was reviewed by Lt. Campbell on July 18, 2011. Campbell determined that Goguen should remain on administrative segregation. Goguen received notice of the decision to keep him on administrative segregation and notice that his placement in administrative segregation would be reviewed on July 22, 2011. On July 22, 2011, a hearing was held to review Goguen's administrative segregation status. Lt. Campbell was the hearing officer and Officers Jewell and Madore were committee members. Goguen attended and testified at the administrative segregation hearing on July 22, 2011. At the hearing Goguen agreed that the evidence supported placing him in administrative segregation and stated that he had requested to go to A-pod because he was unable to do an upper bunk. (Goguen does not deny this in his opposing statement.) The administrative segregation hearing committee determined that Goguen should remain on administrative segregation because his behavior and belief continued to show he was not suitable for population. He continued to argue and confront staff. Goguen remained in A-pod from July 15, 2011, until July 28, 2011. On July 28, Goguen was removed from administrative segregation and moved back to E-pod because he was ready to follow orders and was placed with an upper bunk. (Statement ¶¶ 133-143.)

**8/31/2011 Disciplinary Charge (arguing)**

On August 31, 2011, Rizzo wrote a disciplinary report and a notice of infraction for a

violation of B-13, provocation, for arguing.  These charges were later dismissed.  (Statement ¶ 57.)  However, Goguen returned to A-pod on August 31, 2011, after being assigned to administrative segregation by Plourd for arguing with staff and threatening lawsuits.  Plourd's write up explains that Goguen was placed in segregation for "continually arguing with staff in the performance of their duties," and for "threatening staff with lawsuits when he does not like the orders given to him," despite being placed in segregation several other times.  (ECF No. 56-3 at 17.)  Bugbee removed Goguen from A-pod on September 1, 2011, because Major Allen had advised that Goguen did not pose a threat to security.  Goguen remained in E-pod for a little over three and a half hours on September 1, 2011, after which he was returned to A-pod by Plourd for keeping his back turned during count and based on a charge of arguing and swearing at an officer (described in more detail under the next heading).  (Statement ¶¶ 145-148.)

Lt. Campbell reviewed the placement on September 4, 2011, and determined that Goguen should remain on administrative segregation.  Goguen received notice of the decision to keep him on administrative segregation and of the fact that his placement would be reviewed on September 9, 2011.  On September 9, a hearing was held to review Goguen's administrative segregation status with Plourd as hearing officer and Officer French and non-defendant Officer Ducharme as committee members.  Goguen testified at the hearing and stated that there was an active investigation going on concerning Officer Rizzo and other staff at the jail.  Goguen denies saying this.  He states that what he said was that they should investigate Rizzo's statements.  However, he does not cite any evidence to support his denial and cannot readily discern any sworn testimony to this effect.  Based on Goguen's statement the hearing committee determined that Goguen should remain on administrative segregation until the investigation concluded.  (Id. ¶¶ 149-154.)

Another review hearing occurred on September 16, with Campbell as hearing officer and non-defendant Officers Marose and Davis as committee members.  At the hearing, the administrative segregation hearing committee considered evidence that there was no investigation of jail officers pending, Goguen had no new write ups, and he had been medically cleared.  The committee determined that Goguen should be removed from administrative segregation to disciplinary segregation for an old write up.  On September 21, 2011, Goguen was transferred back to E-pod, where he remained until October 21, 2011.  (Id. ¶¶ 155-160; Opposing Statement ¶ 154, Additional Statement ¶ 91.)  Goguen's general objection to these facts is that the decisions were those of the "placing supervisors" and that none of the decisions was based on any evidence.  (Opposing Statement  ¶¶ 123, 136, 138, 140, 146, 149, 155, 162; Sept. 24, 2011 Supplemental Grievance re. Admin. Status Review, ECF No. 24-1 at 2.)

**9/1/2011 Disciplinary Charge (urinating during count)**

On September 1, 2011, it was announced over the intercom that the inmates were to stand by their bunks or sit up to show they were living and breathing.  Goguen was facing with his back to Rizzo and appeared to be urinating during count.  (Goguen has testified that he was, in fact, urinating during the count.  Goguen Deposition at 71-72.)  Rizzo wrote a disciplinary report and a notice of infraction for a violation of A-05, count.  Rizzo also wrote Goguen up for a violation of B-19, threatening, and B-13, provocation for swearing and calling Rizzo names.  On September 1, 2011, Gilblair gave a copy of the notice to Goguen.  Officer Gilblair was assigned to investigate the incident and spoke to Goguen.  Gilblair told Goguen what the alleged violation was about and asked for Goguen's side of the story.  On September 8, 2011, Goguen received notice that a disciplinary hearing for the incident was scheduled for September 13, 2011.  On September 13, 2011, Crafts held a disciplinary hearing, at which Goguen was present and

testified.  As part of this hearing, Crafts reviewed answers to written questions posed by Goguen

to his cell mate.  Crafts found Goguen guilty of the A-05 count violation and not guilty

of B-19, threatening, and B-13, provocation.  Crafts imposed a $25 fine and three days

disciplinary segregation.  Allen denied Goguen's appeal.  (Statement ¶¶ 58-69;  see also ECF

No. 24-1 at 40-41.)  Goguen's allegation is that urinating is not a violation of count and that the

hearing was held too late (not within 7 days of the event).  (Opposition Memorandum at 15-16, ¶

12.)

**9/6/2011 Request for Manual**

On September 6, Goguen wrote a request to receive the Prisoners Self-Help Litigation

Manual, which he said was taken by A-shift.  (Pl.'s Ex. 4 at 29, ECF No. 56-3.)  The response

was that Goguen had the manual since May, that other A-pod inmates needed access to the

manual, and that Goguen could have it back on September 16.  (Id.)

**9/21/2011 Return to E-Pod**

Goguen was returned to E-pod on September 21, 2011, and remained there until October

21, 2011, when he was once more placed in administrative segregation in A-pod.  (Statement ¶¶

159-160.)

**9/29/2011 Disciplinary Charge (non-receipted coffee and sandwich)**

On September 29, 2011, Rizzo saw Goguen with a black-color liquid in his cup.  Goguen

was drinking the liquid.  Rizzo asked Goguen if he had a receipt for coffee and Goguen said he

did not.  Rizzo asked Goguen to dump it out which he did a couple of minutes later.  Goguen

claims that the liquid was water and that it was the cup that was black.  Rizzo gave Goguen the

option of losing his headphones for forty-eight hours, but Goguen refused and told Rizzo to write

him up.  On September 29, 2011, Rizzo wrote a disciplinary report and a notice of infraction for

a violation of C-04, giving, receiving, or swapping.  (Statement ¶¶ 70-73.)  Goguen has testified that Rizzo was on the upper tier and that he was on the lower tier when this happened and that the cup itself was "disgustingly black" and that Rizzo refused to come look when he asked him to.  (Goguen Deposition at 79.)

Officer Meunier gave Goguen a copy of the notice on September 29, 2011.  Officer Meunier was assigned to investigate the incident and spoke to Goguen.  Meunier told Goguen what the alleged violation was about and asked for Goguen's side of the story.  On September 30, 2011, Goguen received notice that a disciplinary hearing was scheduled for October 3, 2011. (Statement ¶¶ 74-76.)

On October 2, 2011, Goguen was seen eating half of a sandwich while he had a full un-eaten sandwich on his tray.  A review of video showed that another inmate had pushed his tray to the center of the table and that Goguen removed the sandwich.  On October 2, 2011, non-defendant Officer Baldinelli wrote a disciplinary report and a notice for a violation of C-14, unauthorized food, and Goguen received a copy of the notice.  Non-defendant Officer Munn was assigned to investigate the incident and spoke to Goguen.  Munn told Goguen what the alleged violation was about and Goguen said, "Ah fuck it," and that another inmate "threw us under the bus.  I don't need to hear any more."  On October 3, 2011, Goguen was given notice that a disciplinary hearing for the sandwich incident was scheduled for October 6, 2011.  (Id. ¶¶ 77-83.)

Also on October 3, 2011, Goguen had a disciplinary hearing for the coffee incident. Jeffrey Jacques was the hearing officer.  Goguen testified at the hearing and stated that the liquid was water, not coffee.  Goguen received a couple of still photos to present as evidence at the hearing.  Goguen said that any inmate who was standing around there would have known it was

water, but that he did not know any of the inmate's names.  Jacques found Goguen guilty of the

violation and imposed a one-day cell restriction.  Cell restriction means that the inmate is still in

general population, but does not come out of the cell for recreation.  An inmate on cell restriction

can still come out of the cell to eat, to shower, and for appointments.  Jacques based the decision

on the fact that Goguen could have taken the cup up to the duty station to show the officers what

it was, but he did not and that Rizzo had an opportunity to look at what was in the cup.  Goguen

did not appeal this decision.  (Id. ¶¶ 84-92.)  Goguen complains that Rizzo wrote that Rizzo

watched from where he was, but Jacques found that Rizzo had been by the table prior to the

incident and should have been able to see what was in the cup.  (Additional Statement ¶ 21;  Pl.'s

Ex. 2 at 44, 50, ECF No. 24-1.)

The disciplinary hearing for the sandwich incident was held on October 6.  Non-

defendant Michael Johnson was the hearing officer.  Goguen pled guilty at the hearing and

Johnson imposed a four-hour cell restriction.  (Statement ¶¶ 93-95.)

**10/13/2011 Cell Search**

On October 13, 2011, Rizzo was doing a search of Goguen's cell as ordered to do so by

Plourd.  In Goguen's cell Rizzo found a soap dish and soap and neither inmate in the cell had a

receipt and they both said it was not theirs.  Rizzo also found a cup of coffee, dried paper

blocking most of the vent, and an empty coffee bag under Goguen's mattress with a sugar

packet.  These items were contraband.  Rizzo also found an envelope on Goguen's side of the

cell that was sealed and was marked "legal paperwork DO NOT OPEN."  Rizzo opened the

envelope and saw a memo from Major Allen at which point he stopped and took the paperwork

to Plourd to review.  Plourd looked at the paperwork and gave Rizzo the paperwork back and

told him to return it to Goguen, which Rizzo did.  Rizzo wrote a disciplinary report and a notice

of infraction for a violation of C-09, possession.  This charge was later dismissed.  (Statement ¶¶ 96-101.)  Goguen says that it simply is not true in relation to what was found in his cell, but the citation he makes is to his opposition memorandum where he is discussing the coffee incident.  (Opposing Statement at 2, ¶ 97.)

More significantly, Goguen testified that during this cell search Rizzo and Eddie Jacques took thousands of pages of discovery related to one of Goguen's then-pending civil cases (against correctional officers at another county jail) and threw them on the floor, with some landing in the toilet and sink and with the documents coming out of order and being strewn everywhere.  (Goguen Deposition at 81-82, 94.)

**10/17/2011 Shower Request**

On October 17, 2011, Goguen was housed in a cell on the bottom tier in E-pod.  He asked to go upstairs to shower and was told he was not allowed to go to the upper tier for any reason and that as a lower-tier inmate he could not shower after the top of the hour.  Later Goguen, along with another inmate named Gill, argued with Rizzo about the shower rule that inmates are let out of the cell only ten minutes to the hour to take a shower.  In E-pod, there is an upper and a lower tier of cells.  Inmates who are housed in the lower tier are not allowed to go to the upper tier to use the phones or to shower.  Inmates on the upper and lower tiers alternate times out of the cell.  In order to allow time for officers to get away from their desks, the jail uses the "ten of the hour" rule.  At ten of the hour, an officer announces that the cell doors will be opened.  The doors remain open from ten of the hour to the top of the hour so that inmates can use the bathroom or gather things needed for showering.  At the top of the hour, the doors are closed and any inmates in their cells remain in their cells, and any inmates out of their cells remain out of their cells.  (Statement ¶¶ 102-104;  Pl.'s Ex. 2 at 62, 64, 66.)

20

On October 17, 2011, Rizzo wrote a disciplinary report and a notice of infraction for a violation of B-13, provocation, in connection with the shower incident.  Eddie Jacques was assigned to investigate the incident and spoke to Goguen.  Eddie Jacques told Goguen what the alleged violation was about, asked for Goguen's side of the story, and gave Goguen a copy of the notice.  (Statement ¶¶ 105-107.)  On October 20, 2011, Goguen received notice that a disciplinary hearing was scheduled for October 25, 2011.  The hearing actually occurred on October 31, 2011, with Jeffrey Jacques as hearing officer.  Goguen testified at the hearing. Jacques considered video footage, as well as answers to questions posed by Goguen from Llewellyn Eaton, Officer Hayden, and Officer Rizzo.  (Pl.'s Ex. 2 at 4, 6, 9-11.)  Goguen had also posed questions to another inmate, Gill, but Gill had been released so the jail was not able to get answers to the questions.  Jacques found Goguen guilty of the provocation violation and imposed three days of disciplinary segregation.  Major Allen denied Goguen's appeal. (Statement ¶¶ 108-116;  Pl's Ex. 2 at 68.)

**Miscellaneous Grievances and Requests**

Goguen cites a memorandum authored by Sean Maguire, compliance manager.  The memorandum reflects that Goguen filed a number of grievances in late September and in October, including the events described above and others.  (Pl.'s Ex. 4 at 2.)  Among the grievances cited by Goguen in his papers is a September 30 complaint about lack of access to law library books, prison policies, Title 34-A of the Maine Revised Statutes, the self-help litigation manual, and pre-opened legal mail.  (Pl.'s Ex. 4 at 38.)  On October 12, 2011, Goguen requested Title 34-A, again.  (Id. at 39.)  On October 14, he filed another request seeking to reflect that his request for Title 34-A stemmed from the ten-to-the-hour shower incident.  (Id. at 41.)

**10/21/2011 Placement in Administrative Segregation**

On October 21, 2011, Bugbee placed Goguen in administrative segregation and transferred him to A-pod for failing to adjust to the rules and regulations of the facility and for continuing to argue and be confrontational with staff.  This placement was reviewed by non-defendant Lt. Pullen on October 24, 2011, who determined that Goguen should remain on administrative segregation.  Goguen received notice of the decision on October 24, 2011. (Statement ¶¶ 161-163;  Pl.'s Ex. 4 at 23.)  The interesting thing about this particular placement in administrative segregation is that it did not coincide with any particular happening on October 21.  Nor did it coincide with any decision to impose punishment following notice, opportunity to respond, and a due process hearing.  This measure is temporally close to Goguen's active internal grievance activity in October and his upset over having his sealed legal envelope opened and his legal papers strewn about his room by Rizzo.

**Other Disciplinary Hearings**

There were other disciplinary hearings after October 31, 2011, but Goguen did not serve any of the discipline that was imposed from these hearings.  (He had by then been classified as a maximum security inmate.)  (Statement ¶ 117.)

**Maximum Security Classification**

Initially Goguen was classified as a medium security inmate.  On October 26, 2011, Goguen was reclassified from medium security to maximum security because it was determined that he was a danger to the safety and security of the facility.  Goguen received notice of his reclassification and he appealed the reclassification decision.  (The defendants' statement does not describe any due process in advance of the reclassification other than notice.)  The appeal hearing was held on November 1, 2011.  At the appeal hearing, the classification committee

consisted of defendants Teresa Brown and Darlena Bugbee and non-defendants Stephen Giggey

and Chris Murray.  Goguen was present at the hearing and he was allowed to testify.  The

classification committee reviewed log entries concerning Goguen dated between July 23, 2011,

and October 21, 2011.  It determined that Goguen would remain at maximum security because

he was very argumentative and disrespectful to officers and he was unable to follow the rules of

the facility.  The classification committee makes its determinations based on majority vote.  If

there is a tie, Swope or Allen will break the tie.  (Statement ¶¶ 175-183;  Opposing Statement at

3, ¶ 177;  Pl.'s Ex. 4 at 48.)

Goguen was told that he could appeal his classification decision to the jail administrator,

but he did not do so.  He responds that it was the jail administrator who had reclassified him to

maximum security only five days prior.  An inmate is permitted to request review of

classification status by a classification supervisor every 60 days.  An inmate's classification

status is automatically reviewed every 90 days.  Goguen remained in A-pod from October 21,

2011, until he was transferred out of Somerset County Jail in December 2011.  (Statement ¶¶

184-187;  Opposing Statement ¶ 184.)

Maximum security inmates are allowed the same amount of recreation, time for showers,

and time for phone calls as inmates in administrative segregation.  However, corrections officers

place maximum security inmates in four-point restraints when they use the book cart and make

phone calls.  (Statement ¶¶ 188-189.)  Goguen denies that there is any policy requiring four-point

restraints for maximum security inmates using the book cart or making phone calls.  (Opposing

Statement ¶ 189.)  He has testified that this practice was enforced by Almeida, Bugbee, and

Plourd while he was classified as maximum security even though it prevented him from

accessing the law library.  (Goguen Deposition at 42-43, 100.)

**Mail**

Mail that is determined not to be legal mail is opened and inspected for contraband.  Any mail that is determined to be legal mail is not to be opened.  The mail is attached to a legal mail inspection form and forwarded to the housing unit.  The next day an officer in the housing unit will deliver the mail and open any legal mail in the presence of the inmate to check for contraband.  Once it is determined not to have contraband the legal mail is turned over to the inmate.  Inmates are not allowed to have sealed envelopes in their cells and there is no exception for legal mail.  (Statement ¶¶ 190-196.)  Goguen does not deny this, but indicates, correctly, that SCJ policy permits inmates to send sealed envelopes without censoring, inspection, or restriction to certain recipients.  (Opposing Statement ¶ 196;  Pl.'s Ex. Q, Policy 14.1(C)(4), ECF No. 56-11.)

If an inmate in A-pod has outgoing legal mail, A-pod officers go around on the night shift with a sealed box for the inmate to place any legal mail in the box.  The inmate seals the envelope right then before placing it in the box.  For inmates in E-pod, there is a box for mail in the pod.  This box is picked up daily.  The inmate can seal any mail right before placing it in the box.  Legal envelopes with a metal clasp are contraband because the metal clasp can be used to interfere with locks or as a weapon.  (Statement ¶¶ 197-199.)  Goguen maintains that there is no rule about having to seal or not seal any envelopes.  (Opposing Statement ¶ 197.)

**Food**

Goguen alleges that Meunier would touch his sweaty hat and wipe his forearms across his sweaty forehead while handling meal trays.  He says Meunier had a wound on his face at the time.

The defendants' statement asserts that Meunier did have a wound on his nose at one time, but it was not an open wound.  If Meunier did wipe his brow while he had gloves on to serve meals, he wiped his brow with his arm, not his gloved hand.  When Meunier served meals he didn't touch the food, he just placed the utensils on the tray and passed out the trays that were already put together.  (Statement ¶¶ 200-202.)  Goguen says the wound was possibly "scabbed over," but not healed, and he says Meunier touched his sweaty hat prior to handling dining utensils and sometimes touched Goguen's food when it arrived wrapped in plastic.  (Opposition Memorandum at 49, ¶¶ 1-2;  Opposing Statement ¶¶ 200-202;  Additional Statement ¶¶ 152-164.)  Goguen's version is limited by his sworn deposition testimony to an assertion that Meunier sweated profusely and, while handing out food, would wipe his head and then place utensils on trays and hand over the tray.  (Goguen Deposition at 51-52.)

**Legal Book**

In August 2011, Maguire took a legal book back from Goguen.  Goguen had the book for two weeks.  Normally an inmate in A-pod is allowed to keep legal books for one week at a time.  Goguen was given a one-week extension.  After two weeks, Maguire took the book back and gave it to another inmate who requested it.  The book went back to Goguen about three weeks later.  (Statement ¶¶ 203-205.)  Goguen disagrees with this account, but does not cite any evidence to support an alternative finding or that would effectively "deny" the defendants' statement.  (Opposing Statement ¶¶ 203-205;  Additional Statement ¶¶ 101-104.)

**Drawing**

A drawing done by Goguen was confiscated because it was classified as contraband.  It had gang markings or symbols on it and it had color on it.  Goguen had left the drawing inside a magazine in his cell.  The magazine with the drawing in it was found in the possession of another

inmate.  The drawing was made with Speed Stick, Kool-Aid, coffee, ink pen, various plastics and cosmetics.  Color drawings are considered contraband at the jail because some colored drawings have been used to conceal drugs. The inmates then lick or swallow the colored paper to get high. (Statement ¶¶ 206-209.)  Goguen says there were no gang symbols and that it is ridiculous to suggest that inmates would be able to hide drugs in a drawing made inside the jail.  (Opposing Statement ¶¶ 206-209.)  He cites Plaintiff's Exhibit 4 (ECF No. 56-3) at 63-64 in support of the absence of gang markings.  (Additional Statement ¶ 200.)  Page 64 is a radiology report dated November 29, 2012, roughly a year after his departure from Somerset County Jail.

**Strip Searches**

The defendants state, based on an affidavit supplied by Maguire, that inmates on administrative segregation, disciplinary segregation, or maximum security are strip searched every time they enter or leave their cells.  All cells in A-pod are searched at least once per day, whereas cells in E-pod are searched on a monthly basis.  Additional cell searches may also be conducted based on intelligence.  When a cell search is conducted the inmate housed in that cell is strip searched prior to being removed from the cell.  Inmates are strip searched after contact visits, including those with attorneys.  (Statement ¶¶ 210-214, 216.)  These statements are consistent with Goguen's deposition testimony about strip searches while he was housed in A-pod.  (Goguen Deposition at 23.)  The practice does not appear to come from written jail policy. Policy 7.1 governs the treatment of special management inmates, who include those on administrative segregation.   Section B.5 of the policy provides that staff "shall pat search all inmates moved in or out of Special Management."  (ECF PageID # 1044.)  Policy 7.2 governs administrative segregation prisoners.  It indicates in section D.3 that such prisoners are "escorted at all times when outside the housing unit."  (ECF PageID # 1048.)  It does not impose

mandatory strip searches and visual body cavity searches whenever an administrative

segregation inmate leaves his cell.

Around June 6, 2011, there was information that contraband was being moved back and

forth with inmates involved in the work ready program.  Inmates involved in the work ready

program were strip searched for two or three days in a row and their cells were also searched.

(Statement ¶ 215.)  "Impossible," is Goguen's response to the movement of contraband.[2]

(Opposing Statement ¶ 215.)  Goguen references Policy 8.9 (Pl.'s Ex. Q at 45) in his

memorandum and describes the frequency of searches and visual body cavity searches in his

memorandum, but he does not support his statements about frequency with citations to evidence.

(Opposition Memorandum at 44-48.)  Goguen's additional statement addresses strip and visual

cavity searches but, again, his statements are not supported with citations to material of

evidentiary quality.  (Additional Statement ¶¶ 139-151.)  The defendants' statement is silent

concerning visual body cavity searches.  The jail policy reflects that visual body cavity searches

are a standard procedure in all strip searches.  (SCJ Policy 8.9, Pl.'s Ex. Q at 48 ¶ 13.)

In his deposition testimony Goguen testified that Allen instructed that Goguen be

subjected to strip searches every time he was removed from the cell, including for library, law

library, phone calls, showers, recreation, and disciplinary hearings and that he was told by

officers that this treatment was by order of Allen.  (Goguen Deposition at 23.)

**Grievances**

The Somerset County grievance policy provides that a grievance may be initiated by an

inmate for an alleged violation of civil, constitutional, or statutory rights;  an alleged criminal act

or other prohibited act by a staff member;  to resolve a condition existing within the facility that

---

[2]        Goguen's point is that the officers were concerned about the theft of pencils and that it was absurd to do a
visual body cavity (anus) search because no inmate would hide a pencil in that location.

creates unsafe or unsanitary living conditions;  or to resolve a chronic condition existing within the facility that contradicts the Detention and Correctional Standards for Maine Counties and Municipalities.  The first step in the grievance procedure is for an inmate to file a level 1 grievance.  If an inmate is not satisfied with the response to a level 1 grievance the inmate may file a level 2 grievance which is answered by Swope.  If an inmate still is not satisfied after receiving a response to a level 2 grievance the inmate may file a grievance with the Maine Department of Corrections.  This is the final step in the Somerset County Jail grievance procedure.  The grievance policy is outlined in the Somerset County Jail Inmate Handbook which is provided to all inmates upon entry into the Somerset County Jail.  (Statement ¶¶ 217-221.)

Goguen did not file a level 2 grievance concerning his legal mail that was opened outside of his presence.  Goguen only filed one grievance with the Maine Department of Corrections.  This was a letter dated November 27, 2011.  A copy of the grievance letter is attached to the defendants' statement as Exhibit M (ECF No. 45-29).  (Statement ¶¶ 222-223.)

**Other Issues**

On August 31, 2011, Allen ended a phone call Goguen was on with the undersigned to discuss discovery issues in a case against the Penobscot County Jail.  The phone conference was reinitiated about fifteen minutes later and completed.  (Statement ¶¶ 224-225.)

Goguen agrees that on two occasions he did not follow the rules of the jail and was in possession of materials that were not his.  (Id. ¶ 226.)

Goguen agrees that he once acted out and hit a glass door.  (Id. ¶ 227.)

Goguen also flipped off Officer Meunier.  (Id. ¶ 228.)

Plaintiff settled a case against the Penobscot County Jail.  Two lawyers from the Cumberland Legal Aid Clinic were appointed to represent Goguen during discovery and settlement in the case against the Penobscot County Jail.  (Id. ¶¶ 229-230.)

The video surveillance system at the Somerset County Jail does not record audio.  (Id. ¶ 231.)

Goguen complains of back pain.  His evidentiary support consists of an April 2011 classification sheet recording his own representations and a radiology report dated November 29, 2012, roughly a year after his departure from Somerset County Jail.  (Additional Statement ¶ 183;  Pl.'s Ex. 4 at 46, 57, 64.)

Goguen states he has a history of self-harming behavior, but his citation does not support the statement.  (Additional Statement ¶ 188;  Pl.'s Ex 4 at 58.)

Goguen has testified about an incident involving Eddie Jacques and Meunier in which they ordered him to turn his back to the cell door and put his hands together out through a door slot.  They then handcuffed him and pulled the door open suddenly, wrenching his arms and shoulders and causing severe pain in his shoulder and back.  This incident occurred on November 6, 2011, following Goguen's maximum security classification.  (Goguen Deposition at 94-95.)

Lastly, Goguen testified that in December 2011, while classified as maximum security, he was moved from an observation cell to another A-pod cell that had blood, vomit, and feces in it.  Goguen testified that Meunier placed him in the cell and that both Meunier and Kelly denied him any cleaning supplies.  (Goguen Deposition at 55-56, 90-91.)  Goguen also claims this occurred on Allen's orders, but does not indicate the basis for this opinion.  (Id. at 23.)

## LEGAL STANDARDS

This section sets forth the various legal standards that govern the pending motions, including the standard for section 1983 liability, and the standards for assessing constitutional liability in relation to Goguen's many claims.

### A.    Judgment on the Pleadings Standard

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  "A motion for judgment on the pleadings is treated much like a Rule 12(b)(6) motion to dismiss."  Pérez-Acevedo v. Rivero-Cubano, 520 F.3d 26, 29 (1st Cir. 2008).  To determine whether to grant judgment for the moving party, the court must "accept all of the nonmoving party's well-pleaded factual averments as true and draw all reasonable inferences in [its] favor."  Feliciano v. Rhode Island, 160 F.3d 780, 788 (1st Cir. 1998).  So read, judgment on the pleadings should only enter if the complaint fails to raise a plausible entitlement to relief.  Citibank Global Mkts., Inc. v. Santana, 573 F.3d 17, 23 (1st Cir. 2009).  "The court may supplement the facts contained in the pleadings by considering documents fairly incorporated therein and facts susceptible to judicial notice."  R.G. Fin. Corp. v. Vergara-Nunez, 446 F.3d 178, 182 (1st Cir. 2006).  However, "[t]here is no resolution of contested facts in connection with a Rule 12(c) motion:  a court may enter judgment on the pleadings only if the properly considered facts conclusively establish the movant's point."  Id.

### B.    Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The court reviews the factual record in the light most favorable to the non-moving party, resolving evidentiary conflicts and drawing reasonable inferences in her favor.

30

Hannon v. Beard, 645 F.3d 45, 47-48 (1st Cir. 2011).  If the Court's review of the record reveals evidence sufficient to support a judgment in favor of the non-moving party on one or more of her claims, then there is a trial-worthy controversy and summary judgment must be denied to the extent there are supported claims.  Unsupported claims are properly dismissed.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses.").

Pursuant to Local Rule 56(f) all of the facts put forth by the defendant, when properly supported by record citations, are deemed admitted when the plaintiff fails to oppose the statement in accordance with the Local Rule.  However, this court "may not automatically grant a motion for summary judgment simply because the opposing party failed to comply with a local rule requiring a response within a certain number of days."  NEPSK, Inc. v. Town of Houlton, 283 F.3d 1, 7-8 (1st Cir. 2002).  Rather, the court must determine whether summary judgment is "appropriate," which means that it must assure itself that the moving party's submission shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c);  see also Advisory Committee Note to Rule 56 ("Where the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented.").

## C.      42 U.S.C. § 1983

Goguen's action arises under 42 U.S.C. § 1983, which also confers federal question jurisdiction upon this court.  Section 1983, confers upon every United States citizen a right to redress against any person who, acting under color of state law, causes a deprivation of his or her "rights, privileges, or immunities secured by the Constitution and laws" of the United States.  To

31

maintain a claim under section 1983, a plaintiff must establish two things:  (1) that the conduct complained of has been committed under color of state law and (2) that this conduct worked a denial of rights secured by the Constitution or laws of the United States."  Barreto-Rivera v. Medina-Vargas, 168 F.3d 42, 45 (1st Cir. 1999) (citing Martinez v. Colon, 54 F.3d 980, 984 (1st Cir. 1995)).  Other than providing a cause of action, section 1983 of the Civil Rights Act does not confer any substantive rights;  the rights that are vindicated in the action have to arise under another federal statute or constitutional provision.  Baker v. McCollan, 443 U.S. 137, 144 n.3, (1979).  "As in any action under § 1983, the first step is to identify the exact contours of the underlying right said to have been violated."  County of Sacramento v. Lewis, 523 U.S. 833, 842 n.5 (1998).  As county employees, all of the defendants in this action acted under color of state law in connection with their duties within the county jail.  Thus, the only question for decision is whether there exists a genuine issue that defendants deprived Goguen of a constitutional right (Goguen does not contend that any federal statutes were violated).

## D.     The Constitutional Standards

Goguen's claims all fall under the umbrella of the Fourteenth Amendment Due Process Clause.  These include complaints about disciplinary sanctions, hearing irregularities, false accusations of misconduct, unsanitary food and housing claims, lack of meaningful exercise, and unreasonable strip searches and visual body cavity searches.  In addition to such claims, Goguen alleges retaliation against his exercise of the right to petition government in redress of grievances, denial of his right to access legal materials, and interference with his right to communicate with his counsel and with the court.  The following legal standards apply to these varied claims.

### 1.      *Right to Access Court and Counsel*

Prisoners have a constitutional right to meaningful access to courts and counsel, "derived from various constitutional sources." Simmons v. Dickhaut, 804 F.2d 182, 183 (1st Cir. 1986). This claim implicates the First Amendment right to access the courts and the Sixth Amendment right to counsel in defense of a criminal prosecution (to the extent the interference related to Goguen's access to criminal defense counsel), as well as the Fourteenth Amendment's Due Process Clause, Privileges and Immunities Clause, and Equal Protection Clause. Id.; cf. Eaton v. Holbrook, 671 F.2d 670, 671 (1st Cir. 1982).  To be actionable, these claims require that the prisoner demonstrate actual prejudice to pending litigation. Lewis v. Casey, 518 U.S. 343, 353 (1996) (requiring "a nonfrivolous legal claim [being] frustrated or . . . impeded"); Boivin v. Black, 225 F.3d 36, 43 n.5 (1st Cir. 2000) (citing Lewis and requiring a showing of actual injury); see also Sowell v. Vose, 941 F.2d 32, 34-35 (1st Cir. 1991) (observing that there could be cases in which "a prisoner need not show that the deprivation caused him an independent injury," such as where there was an absolute denial of access).

### 2.      *Property Deprivation*

Prison officials are free to search prison cells and to seize "any articles which, in their view, disserve legitimate institutional interests." Hudson v. Palmer, 468 U.S. 517, 528 n.8 (1984).  It is established law that "wholly random searches are essential to the effective security of penal institutions." Id. at 529.  The resulting deprivation (including destruction of the property in question) does not offend due process, either, unless the state affords no opportunity for a post-deprivation remedy. Id. at 530.

In Maine, government employees are liable for the intentional destruction of property when they act in excess of their authority or when they act in bad faith.  14 M.R.S. § 8111(1)(C),

33

(E);  see also Carroll v. City of Portland, 1999 ME 131, ¶¶ 7-9, 736 A.2d 279, 282-83

(discussing the limits of discretionary function immunity under the Maine Tort Claims Act).

This all assumes, of course, that the property in question is not validly classified as contraband.

An inmate has no right to manufacture or keep contraband items in the prison setting.[3]

Although a particular seizure may not run afoul of the Fourth Amendment or the Due

Process Clause, it is conceivable that a deprivation of personal property could form part of a

claim under the Eighth Amendment or Fourteenth Amendment with respect to overall conditions

of confinement.  Palmer, 468 U.S. at 530.

### 3.        Deliberate Indifference to Medical Needs

"A state and its subdivisions are under a substantive obligation imposed by the Due

Process Clause of the Fourteenth Amendment to refrain at least from treating a pretrial detainee

with deliberate indifference to a substantial risk of serious harm to health," Coscia v. Town of

Pembroke, 659 F.3d 37, 39 (1st Cir. 2011), or with "deliberate indifference to serious medical

needs." Feeney v. Corr. Med. Servs., 464 F.3d 158, 161 (1st Cir. 2006) (quoting Estelle v.

Gamble, 429 U.S. 97, 105-106 (1976)).  Ordinarily, deliberate indifference requires "the

complainant [to] prove that the defendants had a culpable state of mind and intended wantonly to

inflict pain . . . or actual knowledge [or wilful blindness] of impending harm, easily preventable."

DeRosiers v. Moran, 949 F.2d 15, 19 (1st Cir. 1991) (citations omitted);  see also Feeney, 464

F.3d at 162.  More recently, however, the Court of Appeals has described the deliberate

indifference standard in less rigorous terms, *when it comes to pretrial detainees*, saying only that

it requires "a showing of greater culpability than negligence but less than a purpose to do harm."

Coscia, 659 F.3d at 39 (Souter, J.).

---

[3]        A non-contraband, art-related claim has been dismissed at the summary judgment stage based merely on the availability of prison grievance proceeding.  Tarselli v. Harkleroad, No. 10-1266, 2012 U.S. Dist. Lexis 22839, at *18-19, 2012 WL 603219, at *6 (W.D. Penn. Feb. 23, 2012).

The focus of this inquiry "is on what the jailers knew and what they did in response."

Burrell v. Hampshire Cnty., 307 F.3d 1, 8 (1st Cir. 2002).  A trial-worthy claim requires that the

plaintiff "satisfy both a subjective and objective inquiry."  Leavitt v. Corr. Med. Servs., 645 F.3d

484, 497 (1st Cir. 2011). The subjective inquiry calls for evidence that a defendant possessed a

culpable state of mind amounting to "deliberate indifference to an inmate's health or safety."

Farmer v. Brennan, 511 U.S. 825, 834 (1994) (internal quotation marks omitted).  The objective

inquiry concerns the harm or need in question, which must involve "a sufficiently substantial

'risk of serious damage to [the inmate's] future health.'"  Id. at 843 (quoting Helling v.

McKinney, 509 U.S. 25, 35 (1993)).  See also Burrell, 307 F.3d at 8 ("[T]he deprivation alleged

must be, objectively, sufficiently serious.").  A medical need is "serious" if it has been diagnosed

by a physician as mandating treatment, or is so obvious that even a lay person would recognize a

need for medical intervention.  Leavitt, 645 F.3d at 497;  Gaudreault v. Mun. of Salem, 923 F.2d

203, 208 (1st Cir. 1990), cert. denied, 500 U.S. 956 (1991)).  These two inquiries generally

overlap and depend on similar evidence.  Leavitt, 645 F.3d at 498.

### 4.    Pretrial Detainees, Due Process, and Punishment

While Goguen was housed at the Somerset County Jail he held the status of a pretrial

detainee, someone charged with, but not convicted of, a crime.  Goguen was detained to ensure

his presence at trial.[4]  In addition to being protected by the "express guarantee[s] of the

Constitution," pretrial detainees have a right "to be free from punishment."  Bell v. Wolfish, 441

U.S. 520, 534 (1979).  "For under the Due Process Clause, a detainee may not be punished prior

---

[4]    Throughout his stay at the Somerset County Jail, Goguen was held by force of state law, having been
unable to make bail on state charges of unlawful sexual contact.  In April 2012, I issued an order of detention under
the federal Bail Reform Act after Goguen settled a lawsuit against certain corrections officers from another facility
and used the proceeds to post state bail.  By the time I issued the order of detention Goguen was no longer held at
the Somerset County Jail.  (Order of Detention in Case No. 1:11-cr-00003-JAW, ECF No. 66.)  Goguen's federal
charges were based on an indictment for failure to register under the Sex Offender Registration and Notification Act,
18 U.S.C. § 2250(a).

to an adjudication of guilt in accordance with due process of law." Id. at 535.  Consequently,

when evaluating claims addressed to the conditions of confinement imposed on a pretrial

detainee that "implicate only the protection of liberty without due process of law," the analysis

turns on "whether those conditions amount to punishment." Id.  Conditions that merit the label

of punishment are necessarily more severe than the loss of freedom and privacy that is inherent

in prison confinement.  Moreover, the government has "legitimate interests that stem from its

need to manage the facility in which the individual is detained." Id. at 540.  These "may require

administrative measures that go beyond those that are, strictly speaking, necessary to ensure that

the detainee shows up for trial." Id.  Thus, administrative measures designed to "maintain

security and order at the institution and make certain no weapons or illicit drugs reach detainees"

are lawful.  Id.

     Among the traditional "guideposts" used to distinguish punishment from legitimate

operational concerns are the following:

> Whether the sanction involves an affirmative disability or restraint, whether it has
> historically been regarded as a punishment, whether it comes into play only on a
> finding of *scienter*, whether its operation will promote the traditional aims of
> punishment—retribution and deterrence, whether the behavior to which it applies
> is already a crime, whether an alternative purpose to which it may rationally be
> connected is assignable for it, and whether it appears excessive in relation to the
> alternative purpose assigned are all relevant to the inquiry[.]

Id. at 537-38 (quoting Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168-69 (1963)).  If a

sanction or condition bears no relation to a legitimate governmental objective and is truly

"arbitrary and purposeless," then a court may infer that it is motivated by an intent to punish.  Id.

at 539.  On the other hand, if the sanction or condition is reasonably related to a legitimate

objective, and is not excessive[5] in relation to the purpose that animates it, it will not amount to punishment unless the facts show the intent to punish.  Id. at 538-39 & n.20.

At all times, courts must be "mindful" that the inquiry is a constitutional inquiry and not an inquiry into how best to run a prison.  Id. at 539.  "The administrators of the prison must be free, within appropriate limits, to sanction the prison's pretrial detainees for infractions of reasonable prison regulations that address concerns of safety and security within the detention environment."  Collazo-Leon v. U.S. Bureau of Prisons, 51 F.3d 315, 318 (1st Cir. 1995).  Measures imposed to ensure prison security, order, and discipline do not amount to prohibited punishment under this framework unless there is evidence of an actual intent to punish the detainee for "*prior unproven criminal conduct,*" id., or the punishment/sanction is not "proportionate to the gravity of the infraction," Surprenant v. Rivas, 424 F.3d 5, 13 (1st Cir. 2005) (citing Collazo-Leon, 51 F.3d at 318).  Arbitrary or disproportionate sanctions, or sanctions that do not further a legitimate penological objective, reflect the kind of punishment that is proscribed by the Fourteenth Amendment when it comes to pretrial detainees.  Id.

In addition to proportionality, there is a procedural requirement of notice and timing. Disciplinary sanctions are not to be imposed on a pretrial detainee[6] before the resolution of a due

---

[5]     Claims of excessiveness require "substantial evidence" that prison officials have "exaggerated their response" to the institutional interest in question.  Bell v. Wolfish, 441 U.S. at 548.

[6]     The Supreme Court's opinion in Sandin v. Conner, 515 U.S. 472 (1995), teaches that a prisoner incarcerated as a result of a criminal sentence has no liberty interest in being free from immediate (no prior process) segregated confinement imposed as a disciplinary measure because such treatment "falls within the expected perimeters of the sentence imposed by a court of law."  Id. at 485.  See also id. at 486 (holding that the due process protections of Wolff are not available for convicted prisoners absent an "atypical, significant deprivation"). Conner's atypical, significant deprivation rule does not apply to discipline meted out on pretrial detainees. Surprenant, 424 F.3d. at 17.

        Unlike sentenced prisoners for whom much institutional punishment can be considered to be within the parameters of the imposed sentence of confinement, see Sandin v. Conner, 515 U.S. 472, 484 (1995), pretrial detainees, serving no sentence and being held only to answer an accusation at trial, have no expectation that, simply by virtue of their status as pretrial detainees, they will be subjected to punishment.

process hearing.  Id. at 13-14;  see also Collazo-Leon, 51 F.3d at 317-319 (discussing how prison officials have considerable leeway to sanction detainees for misconduct, and therefore vacating trial court's award of habeas relief, but remanding for a determination of whether the detainee's procedural rights were violated);  see also Hightower v. Vose, No. 95-2296, 1996 U.S. App. Lexis 24041, at *4 n.3, 1996 WL 516123, at *1 n.3 (1st Cir. Sept. 12, 1996) (unpublished) (noting that pretrial detainees "must be afforded a due process hearing before being punished"); Mitchell v. Dupnik, 75 F.3d 517, 524 (9th Cir. 1996) ("[P]retrial detainees may be subjected to disciplinary segregation only with a due process hearing to determine whether they have in fact violated any rule.");  McGee v. Monahan, 1:06-cv-0358, 2007 U.S. Dist. Lexis 68517, at *17, 2007 WL 2728756, at *7 (N.D. Ill. Sept. 14, 2007) ("[W]hile officials had the authority to punish Plaintiff for misconduct, he was constitutionally entitled to procedural due process in connection with the disciplinary hearings.");  Metcalf v. Brady, 2:05-cv-00243-CI, 2006 U.S. Dist. Lexis 36524, 2006 WL 1455666 (E.D. Wash. May 23, 2006) (denying summary judgment based on genuine issue whether pre-hearing use of "administrative segregation" was in fact punitive and denying request for qualified immunity).

The basic, pre-deprivation process consists, in part, of notice, which requires "advance written notice of the claimed violation and a written statement of the factfinders as to the evidence relied upon and the reasons for the disciplinary action taken."  Wolff v. McDonnell, 418 U.S. 539, 563 (1974).  Prehearing notice must be in writing and it must be sufficient to inform the prisoner of the charges and enable him to prepare a defense.  Such notice must be provided at least 24 hours before the hearing.  Id. at 564.  Finally, following the hearing, the factfinder(s) must provide further notice in writing that describes the evidence relied on and the

---

Rapier v. Harris, 172 F.3d 999, 1003 (7th Cir. 1999) (concluding that summary judgment for defendants was warranted based on qualified immunity where detainee was place in "drunk tank" and in solitary without pre-deprivation process based on combative and offensive behaviors).

reasons for the disciplinary action.  Id.  Pre-deprivation process also includes a right to call

witnesses and to present documentary evidence when the exercise of that right "will not be

unduly hazardous to institutional safety or correctional goals."  Id. at 566.  Witness confrontation

and cross-examination are not mandatory.  Id. at 567-68.  There is no right to counsel.  Id. at 570.

 In Surprenant, the evidence demonstrated that a pretrial detainee suffered punitive

segregation on false charges made by a corrections officer, prior to being heard.  The

falsification of the disciplinary charge by the individual corrections officer, coupled with the

immediate imposition of segregation, gave rise to a due process violation.  Surprenant, 424 F.3d

at 14.  Central to the analysis were the conditions of segregation:

> Inmates in segregation cells were allowed only a mattress, sheet, pillow, and
> prison uniform.  All other items were forbidden, even legal papers, writing
> instruments, and articles essential to personal hygiene (like soap and toilet paper).
> Although each cell contained a sink and toilet, the jailers restricted inmates' water
> usage in order to prevent deliberate flooding.  Thus, each cell's water supply was
> turned off regardless of whether the occupant had ever been involved in a
> flooding incident.  If an inmate needed to flush his toilet, get a drink, or wash his
> hands, he had to ask a correctional officer to turn on the water momentarily.
> Frequently, no correctional officer was nearby and, even if one was in the
> vicinity, the inmate ran the risk that the officer would choose either to ignore his
> request or to dawdle in fulfilling it.

Id. at 10.  To these conditions were added certain additional indignities, including release from

the cell "only once every three days, in shackles, for a quick shower";  a prohibition on telephone

calls, mail, and non-attorney visitors;  and "as many as five in-cell strip searches each day," with

the prisoner being required "to manipulate his armpits, groin, and buttocks before manipulating

his cheeks and tongue."  Id. at 10-11.  These conditions were sufficiently onerous to amount to

"punishment" for purposes of the Fourteenth Amendment with respect to pretrial detainees.  At

the other end of the spectrum, courts must also be on the lookout for prison conditions claims

that are "de minimis" and "do not implicate constitutional concerns."  Hightower, 1996 U.S.

App. Lexis 24041, at *6, 1996 WL 516123, at *2.  For example, "a single instance of being denied a shower for eight days, without more," does not amount to a due process violation.  Id.

Under these standards, not every prehearing placement in segregation will amount to a due process violation.  In fact, the use of prehearing administrative segregation is permitted. However, if the conditions of prehearing administrative segregation at a particular facility are punitive and the detainee is placed in those conditions without Wolff v. McDonnell process, that will give rise to a claim.  In addition to the sorts of conditions described in Surprenant, such a claim is capable of gathering up diverse "conditions" to demonstrate punishment, including "use of force" facts such as the application of restraints for purposes of punishment or the infliction of pain in connection with the use of restraints.  D. Me. Pattern Jury Inst. for Cases of Excessive Force (Hornby, J.) at 15-16 & n.1.

Finally, it cannot be overlooked that section 1983 claims involving conditions of confinement are not actionable under section 1983 if they challenge the validity of the prosecution or the validity of the plaintiff's detention or conviction, unless the underlying order of detention or conviction has first been favorably terminated on direct review, expunged by executive order, declared invalid by an authorized state tribunal, or called into question in a federal court's writ of habeas corpus.  Heck v. Humphrey, 512 U.S. 477, 486-87 (1994);  see also Edwards v. Balisok, 529 U.S. 641, 647-48 (1997).  However, claims related to disciplinary proceedings are not subject to the Heck v. Humphrey bar if they do not call into question the validity of detention, conviction, or the duration of a sentence.  Muhammad v. Close, 540 U.S. 749, 751 (2004) (per curiam) ("Heck's requirement to resort to state litigation and federal habeas before § 1983 is not, however, implicated by a prisoner's challenge [of special disciplinary confinement] that threatens no consequence for his conviction or the duration of his sentence").

Here, Goguen's section 1983 action does not challenge the validity of his pretrial

detention, the duration of his detention, or any resulting conviction and so the rule stated in Heck

v. Humphrey does not bar his section 1983 claim.

### 5.     First Amendment Retaliation

Prison inmates, whether pretrial detainees or convicts, have the right under the First

Amendment to petition government for the redress of grievances.  This right includes petitions

directed to the courts, Hannon, 645 F.3d at 48;  Leonardo v. Moran, 611 F.2d 397, 398 (1st Cir.

1979), as well as internal prison grievances, Hightower, 1996 U.S. App. Lexis 24041, at *3-4,

1996 WL 516123, at *1;  L'Heureux v. Ashton, No. 95-2194, 1996 U.S. App. Lexis 2026, at *3,

1996 WL 55707, at *1 (1st Cir. Feb. 9, 1996) (unpublished).

"Because prisoner retaliation claims are 'easily fabricated[] and . . . pose a substantial

risk of unwarranted judicial intrusion into matters of general prison administration,' courts must

insist that such claims are bound up in facts, not in the gossamer strands of speculation and

surmise."  Hannon, 645 F.3d at 48 (quoting Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003)).

To prove a retaliation claim at summary judgment, "a prisoner must make out a prima facie case

by adducing facts sufficient to show that he engaged in a protected activity, that the state took an

adverse action against him, and that there is a causal link between the former and the latter."  Id.

In the first amendment context, an adverse action must be "more than de minimis," which means

the action must be sufficient to chill a person of ordinary firmness in the performance of future

first amendment activities.  Pope v. Bernard, No. 10-1443, 2011 U.S. App. Lexis 2764, at *4,

2011 WL 478055, at *2 (1st Cir. 2011) (per curiam) (unpublished).  The inquiry into whether an

action is sufficiently adverse to support a claim is based on an objective standard rather than a

subjective one, such that it is "capable of screening the most trivial of actions from constitutional

cognizance." Thaddeaus-X v. Blatter, 175 F.3d 378, 398 (6th Cir. 1999). For example, the First

Circuit has held that inmates of ordinary firmness would not be dissuaded from first amendment

activity based merely on the filing of a retaliatory disciplinary charge where the evidence

revealed that such charges stood a reasonable chance of being overturned during an impartial

hearing held prior to discipline. Starr v. Dube, 334 Fed. Appx. 341, 343 (1st Cir. 2009)

(unpublished) (citing authority to the effect that a single retaliatory disciplinary charge for which

a pre-discipline defense could be raised before a neutral arbiter would not deter an inmate of

ordinary firmness from continuing to exercise his rights).

Acts that cause an inmate to experience discomfort for a few days are considered de

minimis. Star v. Dube, 334 Fed. App'x 341, 342 (1st Cir. 2009). Along the same lines, "[v]erbal

threats and name-calling usually are not actionable" under 42 U.S.C. § 1983. Ellis v. Meade,

887 F. Supp. 324, 329 (D. Me. 1995) (quoting McDowell v. Jones, 990 F.2d 433, 434 (8th Cir.

1993)). In Thaddeaus-X, the Sixth Circuit noted that "the definition of adverse action is not

static across contexts. Prisoners may be required to tolerate more than public employees, who

may be required to tolerate more than average citizens, before an action taken against them is

considered adverse." 175 F.3d at 398.

Evidence of repeatedly being subjected to strip searches is sufficient to establish a triable

retaliation claim, if the searches were motivated by retaliatory animus. See Swain v. Spinney, 117

F.3d 1, 10 (1st Cir. 1997) (holding that the defendant officers were not entitled to summary judgment

on qualified immunity when "[o]n the facts as related by [the plaintiff], [the defendant who ordered

the search] used a warrantless strip search and visual body cavity inspection as a tool to humiliate

and degrade her in retaliation for her refusal to respond to interrogation"); Mays v. Springborn, 575

F.3d 643, 650 (7th Cir. 2009) (holding that the plaintiff's testimony that he was subjected to a non-

routine and humiliating strip search in retaliation for his complaint about routine searches raised a fact issue that should have gone to the jury).

As for demonstrating a link between the protected activity and the adverse action, direct proof is not required; circumstantial evidence may be enough to support an inference of retaliatory purpose. Hannon, 645 F.3d at 49. Circumstantial evidence may include a close temporal relationship between the protected activity and the adverse action, the falsification of institutional records, and deviations from standard operating procedures. Id.

DISCUSSION

**A.**     **Discussion of Goguen's Claims**

Goguen maintains that he was subjected to intentional punishment based on his tendency to file grievances and speak out if he perceived what he believed to be a violation of his rights or a violation of prison policy, and also based on his litigation against correctional officers from another facility. The punishment consisted of excessive confinement in administrative segregation, unreasonable reclassification to maximum security, excessive strip searches and body cavity searches, confiscation of legal documents, interference with his communications with the court and with counsel, confiscation of personal property, placement in an unsanitary cell, unsanitary food practices, application of excessive force, and imposition of four-point restraints to frustrate access to legal materials. Goguen also advances a claim of first amendment retaliation, another claim that has the ability to gather up multiple circumstances in support of one claim. In addition to advancing these two core theories, Goguen also itemizes a laundry list of smaller claims based on each distinct incident of which he complains. For the most part, these are collected at the end of his complaint, in paragraphs 321 through 336. I have structured my discussion to generally track the claims as they are itemized at the end of the complaint, particularly because this is the location where Goguen identifies which individual defendants he

pursues his varied claims against.  However, I have reserved discussion of the due process and

retaliation claims for last.  For reasons that follow, there is a genuine issue that calls for the

denial of summary judgment with respect to Goguen's two core theories of liability, except with

respect to a few of the defendants.  These claims are capable of gathering up many of the facts

and circumstances on which the individualized claims are based, even though the individualized

circumstances would not be actionable as freestanding claims.  Some of the individualized

claims are not viable even as components of the broader claims.

### 1. *Access to court, counsel, legal books, and legal materials*

Goguen claims violations of the First Amendment and the Sixth Amendment related to

the right to access the court and counsel, based on the seizure of legal papers and books, denial

of law library access and materials, and interference with communications with the court and

with counsel, asserted against Defendants Allen, Bugbee, Gilblair, Jacques, Kelly, Maguire,

Meunier, Plourd, Rizzo, and Swope.  (Second Am. Complaint ¶ 322.)  As discussed in my

recitation of the legal standards, this claim requires that Goguen demonstrate actual prejudice to

pending litigation.   The facts presented by Goguen simply do not permit a meaningful

assessment of the actual prejudice standard and, consequently, summary judgment should enter

against this claim.  Nevertheless, facts and circumstances related to throwing Goguen's legal

papers about, opening his mail, interrupting his conferences with the court, and so forth, are

relevant to the core claims of imposing punishment on a pretrial detainee without due process of

law and of retaliating against a pretrial detainee for pursuing petitions in redress of grievances.

### 2. *Timely review process.*

Goguen claims that Defendants Bugbee and Plourd (both lieutenants) failed to conduct

72-hour reviews of decisions to impose administrative segregation and also permitted

administrative segregation to continue beyond seven days.  (Id. ¶ 323.)  Goguen also asserts this

claim against Defendants Allen (jail administrator), Maguire (compliance officer), and Swope

(assistant jail administrator), for allegedly creating and implementing a policy that denies

meaningful 72-hour and 7-day reviews of administrative segregation decisions.  (Id. ¶ 325.)

The problem with this particular theory is Goguen's mistaken assumption that the

Constitution establishes either the 72-hour or the 7-day timeframes.   Caruth v. Pinkney, 683

F.2d 1044, 1052 (7th Cir. 1982) (per curiam), cert. denied, 459 U.S. 1214 (1983).  These

timeframes arise from prison policies.  They are not constitutional mandates.[7]

As indicated previously, the real claim here involves the imposition and maintenance of a

punitive form of administrative segregation, prehearing.  The facts reflect that Allen had direct

oversight or involvement related to one or more impositions of administrative segregation

without the benefit of due process.  This makes him an appropriate defendant on the core

procedural due process claim.  The same goes for Bugbee, who more than once imposed punitive

segregation, prehearing, including an extension of segregation even after the hearing officer

concluded that the charge in question did not warrant disciplinary segregation.  The facts also

indicate that Allen and Plourd imposed administrative segregation conditions that could fairly be

regarded as punitive, without the benefit of a hearing.  These defendants are all implicated in the

---

[7]        The same assessment applies with respect to Goguen's complaints about alleged mismanagement of the
prison grievance policy (Policy 11.3, ECF No. 56-11 at 103.)  "[T]here is no inherent right to a prison grievance
proceeding."  Crawford v. Compton, No. 88-5400, 1988 U.S. App. Lexis 13952, at *2, 1988 WL 104929, at *1 (6th
Cir. Oct. 11, 1988).  State created procedural rights do not establish a protected liberty interest requiring the
procedural protections of the Fourteenth Amendment.  Azeez v. DeRobertis, 568 F. Supp. 8, 10 (D. Ill. 1982).
Assuming that the underlying prison condition that Goguen sought to complain about otherwise concerned a
deprivation of constitutional dimension, that claim will be preserved provided that Goguen himself follows the rules
of the prison's grievance process.  If he was denied access to the grievance process, that fact can prevent the
defendants from relying on the exhaustion affirmative defense found in 42 U.S.C. § 1997e(a) with respect to the
underlying prison-conditions claim.  Jones v. Bock, 549 U.S. 199, 212, 216 (2007) (holding that failure to exhaust is
an affirmative defense); Woodford v. Ngo, 548 U.S. 81, 93-94 (2006) (discussing the concept of "proper
exhaustion").  If that is the case, then the prisoner is not ultimately denied access to petition the government in
redress of grievances because he may have his claim evaluated in federal court.  Antonelli v. Sheahan, 81 F.3d 1422,
1430 (7th Cir. 1996).  These allegations did not develop into one of the claims listed at the end of Goguen's
complaint, but the defendants have treated the allegations as an independent claim.  (Motion at 5.)

core due process claim, which will be discussed further, below.  However, the parties' statements do not describe direct involvement by Swope or Maguire in any alleged prehearing imposition of punitive segregation.

### 3.      Reclassification to Maximum Security

Goguen asserts a violation of due process based on a classification hearing held November 1, 2011, and asserts the claims against Defendants Allen, Brown, and Bugbee.  (Id. ¶ 326.)  It is a reasonable inference from the record to conclude that there was no process preceding the initial reclassification imposed by Allen.  The initial reclassification decision therefore is part of the due process claim against Allen.

Entirely unclear, however, is whether the maximum security reclassification appeal proceedings complied with Wolff v. McDonnell, though it is known that there was a hearing.  On this record, Goguen has not satisfied his burden of showing that the members of the classification appeal committee shortchanged him procedurally before making their classification decision.

### 4.      Adequacy of Written Notices

Goguen asserts a due process claim based on "inadequate notices of rule violations, refusing to give sufficient factual specificity," and he asserts the claim against Defendants Allen, Maguire, and Swope.  (Second Amended Complaint ¶ 327.)  Goguen's complaint is not that he did not receive written notice of the charge against him, but that the notice did not contain a narrative account of the underlying allegations.  I cannot discern from the parties' factual statements that there were any circumstances in which a short written identification of the charge prejudiced Goguen's ability to understand the factual basis for the charge and prepare a defense. Nevertheless, this limited predeprivation process fell short of the requirements of Wolff v. McDonnell and the written notices are relevant evidence in connection with the overarching due

46

process claim involving punitive segregation without adequate predeprivation process. That being said, there is no reason to treat this claim as a free-standing claim. Rather these facts are subsumed within the broader due process claim.

### 5. *Refusing exculpatory evidence and failing to overturn*

Goguen alleges violations of due process based on "refusing exculpatory evidence and failing to overturn," and asserts the claim against Defendants Allen, Crafts, and Jacques. He also alleges against Gilblair, Hayden, Jacques, Meunier, and Rizzo, "intentionally fabricating reports and filing misleading evidence to support these proceedings." (Second Amended Complaint ¶¶ 328, 329.) The facts do not support a finding of any constitutional violation by Crafts, Hayden, or either Jacques defendant. Nor do I see any basis for an independent claim premised on the refusal of exculpatory evidence or failing to overturn. However, as far as Allen, Gilblair, Meunier, and Rizzo are concerned, the claim of false evidence should be treated as subsumed within the broader due process and retaliation claims.

### 6. *Work-Ready Program Strip Searches*

Goguen alleges a violation of the Fourth Amendment and the Fourteenth Amendment based on strip and visual body cavity searches imposed in connection with a work-ready program, and he asserts the claim against Defendants Bugbee and Plourd. (Second Amended Complaint ¶ 330.) The facts concerning these particular strip searches do not warrant an inference of intent to punish, for purposes of the Fourteenth Amendment due process claim, or an inference of first amendment retaliation against Goguen. Nor did this limited intrusion result in a violation of the Fourth Amendment. "[D]eterring the possession of contraband depends in part on the ability to conduct searches without predictable exceptions." Florence v. Bd. of Chosen Freeholders, 132 S. Ct. 1510, 1516 (2012) (involving routine strip and body cavity

searches of inmates upon entry into jail population). "In addressing this type of constitutional

claim courts must defer to the judgment of correctional officials unless the record contains

substantial evidence showing their policies are an unnecessary or unjustified response to

problems of jail security." Id. at 1513-14. Goguen has testified that these searches were

conducted merely because of a belief that pencils were being taken from the program and he

points out that no rational inmate would hide a pencil in a body cavity. This he bases entirely on

his own testimony. He offers no indication of why he believes this is so. Goguen fails to

establish a genuine issue whether the searches were truly motivated entirely to locate pencils.

Assuming that the searches were entirely based on a desire to locate pencils, there is nothing

inherently unreasonable about conducting a strip search to locate contraband pencils. Although a

strip search without a visual body cavity search seems like a more measured response, the more

invasive search procedure, which appears to be routinely administered in all strip search

scenarios at Somerset County Jail, does not establish a fourth amendment violation or fourteenth

amendment violation in the context of a suspicion-based and program-based effort to deter the

movement of contraband. Wolfish, 441 U.S. at 558.

### 7. *Seizure of Unique Property*

Goguen asserts violations of the Fourth Amendment, the Fifth Amendment, and the

Fourteenth Amendment based on the "seizure of irreplaceable unique property," and names

Allen as the appropriate defendant. (Second Amended Complaint ¶ 332.) The property in

question is a drawing he made with Speed Stick, Kool-Aid, coffee, ink pen, various plastics and

cosmetics. This freestanding claim is not viable unless there is no adequate post-deprivation

remedy, an issue that Goguen fails to address and therefore waives. Romero-Barcelo v.

Hernandez-Agosto, 75 F.3d 23, 33 (1st Cir. 1996) (declining to address whether an adequate

postdeprivation remedy is available under state law absent allegations or argument addressed to the issue by the plaintiff). Goguen fails to articulate any reasoned basis for pressing a fourth amendment claim or fifth amendment claim based on this deprivation and I cannot see any legitimate ground for it. Apart from these independent reasons to dismiss the claim, Goguen failed to administratively exhaust the claim. Summary judgment should enter for Defendant Allen on this particular claim for relief. Administrative exhaustion will be discussed in section B of this discussion.

### 8.    *Food Practices, Taunting, Harassment, and Referral for Mental Health*

Goguen asserts these claims against Defendants Almeida and Meunier and says the claims involve violations of the Eighth Amendment and the Fourteenth Amendment. (Second Amended Complaint ¶ 333.) Goguen's factual statements simply fail to develop facts that could support a finding of a deliberate indifference claim related to medical needs or a serious health risk. Goguen's statements also fail to support the taunting and harassment allegations beyond what is otherwise discussed in this recommended decision. As for the food practices claim, this claim runs only against Meunier. The facts concerning food handling are de minimis and do not support a conditions-of-confinement claim or deliberate indifference claim under the Fourteenth Amendment.

### 9.    *Recreation and Exercise*

Goguen alleges violations of the Eighth Amendment and the Fourteenth Amendment based on the denial of "reasonable out of cell recreation and meaningful exercise," and he asserts the claim against Defendants Allen, Maguire, and Swope. (Second Amended Complaint ¶ 334.) There is no meaningful factual development in Goguen's statements that would support a claim against Maguire or Swope based on limited recreation. However, the facts related to this

condition inform the overall picture related to the conditions of administrative segregation. The conditions form part of the overall due process claim, even though the due process claim likely would not go forward if reduced recreation were the only condition of which Goguen complained.

### 10.   *Unsanitary Cell*

Goguen asserts violations of the Eighth Amendment and the Fourteenth Amendment based on his temporary placement in an unsanitary cell, and he asserts the claim against Defendants Allen, Almeida, Kelly, Meunier, and Plourd.  (Id. ¶ 335.)  The Fourteenth Amendment sets the appropriate standard.  Technically, there is no eighth amendment claim for Goguen to assert against state officials.  If this incident of relatively brief exposure to an unsanitary cell were the only evidence of "punishment" or a retaliatory mindset, it would not be enough to support a claim, in my view.  On the other hand, the facts related to this condition of confinement form part of the facts and circumstances related to Goguen's core due process claim against Meunier and his retaliation claim against Meunier and Kelly.  As for Allen and Plourd, Goguen's presentation does not build the claim against either of them because Goguen has not identified evidence that Allen or Plourd authorized or encouraged this treatment or that either man had any opportunity to countermand it.

In any event, although this incident would ordinarily inform Goguen's broader claims, this particular incident is not actionable because Goguen failed to administratively exhaust this component of his case.  Administrative exhaustion is discussed in section B, below.

### 11.   *Prehearing Punitive Segregation*

Goguen asserts claims under the Fourth Amendment and the Fourteenth Amendment based on multiple daily strip and visual body cavity searches imposed throughout his housing in

A-pod.  He alleges that these were conducted by Allen, Almeida, Bugbee, French, Hayden, Maguire, Meunier, Plourd, Rizzo, and Swope.  (Second Amended Complaint ¶ 331.)  The searches at issue in this case were a condition of confinement imposed on all inmates in A-pod, whether classified as administrative segregation, disciplinary segregation, or maximum security. Based on the summary judgment presentation, a reasonable fact finder could conclude that the Somerset County Jail does not afford any middle-ground treatment when it comes to the administrative segregation of pretrial detainees for disciplinary purposes, despite the right detainees have to be free from prison punishment prior to a disciplinary hearing.  The record is sufficient to support a finding that simply to be housed in A-pod entails multiple strip and visual body cavity searches every day, regardless of one's status or classification.  In terms of the Jail's policy, pretrial detainees handled in this way are effectively treated as though they pose a "serious threat" to safety, security, or order without the benefit of any predeprivation due process.  These facts generate[8] a genuine issue related to the imposition of punitive conditions on a pretrial detainee, without a prior hearing.  These facts are part of the facts and circumstances that inform the due process claim against the officers who participated in placing Goguen in administrative segregation without prior compliance with the due process standard set forth in Wolff v. McDonnell.  There is no justification, however, for carving out a freestanding strip search claim separate from the overarching fourteenth amendment claim.

Allen, Gilblair, Meunier, Plourd, and Rizzo are implicated in the core due process claim for imposing punitive conditions on Goguen without the benefit of a pre-deprivation hearing. The due process claim also gathers up Bugbee and French for their July 1, 2011, imposition of administrative segregation.  There is no summary judgment statement from Goguen that would

---

[8]     Were it not for the multiple daily strip searches and visual body cavity searches, it would be a much closer case to call.  It is the addition of the strip search protocol that really reflects the punitive quality of the overall conditions that Somerset County Jail officers impose as part of "administrative" segregation.

implicate Almeida, Hayden, Maguire, or Swope in the imposition of punitive segregation or in

the performance of strip searches while Goguen was housed in A-pod.  However, Goguen has

testified concerning Almeida's participation in the strip search protocol by instructing Goguen to

comply under threat of the use of chemical mace.  This testimony also implicates French.

(Goguen Deposition at 98-99.)  Based on this testimony, Almeida and French are appropriate

defendants.  Only Hayden, Maguire, and Swope deserve summary judgment based on

insufficient summary judgment evidence.  It may well be the case that additional officers

conducted these searches, but the summary judgment materials that I reviewed do not

demonstrate who other than French actually conducted the searches while Goguen was housed in

A-pod awaiting due process on pending disciplinary charges.

Goguen also claims that his due process rights were violated based on intentional false

reports of misconduct, designed to impose administrative segregation as a form of punishment,

which he has asserted against Defendants Gilblair, Hayden, Meunier, and Plourd.  (Second Am.

Compl. ¶ 321.)  Gilblair and Meunier are embroiled in this controversy based on the cell search

and resulting segregation of June 23, 2011.  On one version of the facts, Gilblair was yelling and

cursing at Goguen because of his desire to observe the search (in conformance with jail policy)

and Goguen himself was not acting out.  Nevertheless, Meunier wrote Goguen up for interfering

and provocation.  Goguen was rehoused in administrative segregation on June 23, by Sergeant

Plourd, based on reports made by Gilblair and Meunier.  The facts do not reflect any

participation by Officer Hayden on June 23.  Nor do the facts reflect that Hayden otherwise

made false reports at any time in order to subject Goguen to punishment.

As for the search itself, the Constitution did not require any cause to search Goguen's

cell.  Nor did the Constitution afford Goguen a right to be present when his cell was searched.

Bell v. Wolfish, 441 U.S. 520, 556 (1979);  Mitchell, 75 F.3d at 522.  The cell search, even if improperly motivated, was not "punishment" for purposes of the Fourteenth Amendment.

The real issue here involves the imposition of punishment on a pretrial detainee, without adequate predeprivation process.  Although Goguen's move was classified as administrative segregation rather than disciplinary segregation, if the conditions of confinement imposed on him in A-pod crossed the punishment threshold, a claim is established for imposing prehearing punishment on a pretrial detainee.[9]

The conditions of administrative segregation at the Somerset County Jail included a restriction against hardcover books and possibly some other property items.  Temporary imposition of these conditions falls in the "reasonable" category and does not amount to punishment.  Administrative segregation also reduced Goguen's time out of cell and the space and time available for recreation.  Goguen could exercise by himself for one hour daily, five days per week, in a five-by-ten cell.  Goguen's ability to shower was also reduced to three times per week and he could have only one phone call per week.  It is not necessary to decide whether

---

[9]       On page 19 of their motion, the defendants rely, in part, on Hewitt v. Helms, which holds that "an informal, nonadversary evidentiary review is sufficient both for the decision that an inmate represents a security threat and the decision to confine an inmate to administrative segregation pending completion of an investigation into misconduct charges against him." 459 U.S. 460, 476 (1983).  At least one court of appeals has held that Hewitt-style process permits the expedited placement of a detainee in administrative segregation pending an investigation.  Benjamin v. Fraser, 264 F.3d 175, 190 (2d Cir. 2001).  I agree with this view.  However, the conditions imposed in segregation must not be punitive.  My recommendation is not based exclusively on the fact that Goguen was segregated pre-hearing (segregation alone is not punishment), but on the fact that the combined conditions of administrative segregation at Somerset County Jail could reasonably be regarded as "punitive."  Because of the punitive characteristics of administrative segregation at the Somerset County Jail, pre-deprivation process is required when a pretrial detainee is moved to administrative segregation, unless the officers refrain from subjecting the detainee to multiple daily strip searches and body-cavity searches over the course of several days while the detainee awaits Wolff-style process.  The genuine issue, in other words, concerns the imposition of *punishment* pre-hearing.  For example, in this case there can be no viable constitutional claim arising from the actual imposition of discipline following due process hearings, such as the imposition of three days of "disciplinary segregation" for urinating during count, or the one-day cell restriction imposed for giving-swapping-receiving.  Rather, the concern is that Goguen spent multiple weeks in administrative segregation (pre-hearing), during which time he was subjected to all of the punitive conditions of disciplinary segregation, including strip searches and visual body cavity searches every time he crossed the threshold of his cell.  Calling the segregation administrative does not mean it is not punitive.  Here, a jury could reasonably conclude that the conditions of administrative confinement at Somerset County Jail are too severe for a pretrial detainee accused of minor infractions within the jail.

these conditions, in combination, cross the "punitive" threshold for a pretrial detainee, because administrative segregation also included a condition requiring multiple daily strip searches and visual body cavity searches.  According to the defendants' statement, any time Goguen was allowed to leave his cell such as to take a shower or for recreation he would be subjected to the strip search and visual body cavity search protocol upon leaving and upon returning to his cell. In addition, Goguen would be strip searched at least once every day simply as part of the mandatory daily cell search.  This final condition is sufficient to support a finding of punitive confinement, without due process, regardless of the fact that Somerset County calls it "administrative" confinement.  Indeed, after Goguen eventually received process at the Jail, his actual sanctions typically paled in comparison to what he experienced while waiting for the process to unfold.  For example, he was assessed three days of disciplinary segregation for urinating during count, but suffered approximately 13 days of what amounted to disciplinary segregation while awaiting his hearing.  These conditions and the various facts and circumstances identified as relevant in the preceding discussion raise a genuine issue of material fact concerning the denial of due process.[10]

---

[10]      The defendants would argue that this recommendation is untenable in light of <u>Florence v. Board of Chosen Freeholders</u>, 132 S. Ct. 1510 (2012).  (Motion at 26.)  In <u>Florence</u>, the Supreme Court held that institutional security needs override a detainee's privacy rights when a detainee is first introduced to a new detention center.  132 S. Ct. at 1517-18.  Strip searches and visual body cavity searches were deemed appropriate in this context even in the absence of reasonable suspicion because the claimant did not have substantial evidence that the institutional response to the situation was exaggerated and because the record provided "full justification" for the procedures used.  <u>Id.</u> at 1518.  <u>Florence</u> does not counsel against the due process recommendation expressed herein because the circumstances of Goguen's case called for due process before subjecting him to a steady diet of multiple daily strip and visual body cavity searches as a price for entering or exiting a segregated prison cell.  Here, the record contains evidence that Goguen was subjected to a punitive change in the conditions of his confinement based on minor disciplinary charges without the benefit of procedural due process.  This recommended decision is <u>not</u> to the effect that these searches cannot be imposed on pretrial detainees when they are placed in disciplinary segregation following <u>Wolff</u> process.  If personnel at the Jail cannot safely segregate pretrial detainees for administrative purposes (in A-pod or elsewhere) without imposing this condition of confinement, then they should keep the detainee in E-pod and administer the <u>Wolff</u> procedures more expeditiously.  (Note that the record lacks a full justification for why Somerset County Jail officers need to impose such conditions before providing the limited procedural protections outlined in <u>Wolff</u>.)

### 12.     First Amendment Retaliation

Goguen alleges that he suffered retaliation for filing grievances and he asserts the claim against Allen, Almeida, Bugbee, Gilblair, Hayden, Jacques, Kelly, Maguire, Meunier, Plourd, Rizzo, and Swope.  (Second Amended Complaint ¶ 324.)  For each defendant Goguen must link up his protected activity, the imposition of an adverse action, and circumstantial evidence of a causal relationship.  He has not done so sufficiently with respect to Jeffrey Jacques[11] or with respect to Hayden, Maguire, and Swope.  He has done so with respect to Kelly and Meunier, based on the imposition of confinement in an unsanitary cell, without cleaning supplies, but that particular episode is not exhausted and therefore not actionable.  Goguen has generated a genuine issue with respect to Almeida, Bugbee, and Plourd based on their imposition of four-point restraints in connection with Goguen's access to the library cart.  Although Goguen was classified as maximum security at the time, there is a genuine issue whether the four-point restraints were a disproportionate reaction influenced by Goguen's petition activity.  The fact finder might regard it as telling that the *one* notable new condition of confinement that arose from the reclassification, use of a four-point restraint when Goguen accessed the library cart, was directly related to his first amendment activity.[12]  The maximum security classification also implicates Allen, who first classified Goguen as maximum security.  The adverse actions by Gilblair and Meunier are those I have deemed adequate to support a due process violation.  That same conduct is sufficient to raise a genuine issue for purposes of the retaliation claim.  Lastly, Rizzo's participation is essentially on par with that of Gilblair and Meunier and he is embroiled in this same genuine issue.  Meunier and Eddie Jacques are also implicated based on their rough

---

[11]     There is an assertion of rough treatment by Eddie Jacques, coupled with participation in throwing Goguen's legal papers all over his cell.

[12]     The defendants' motion indicates that the problem with the four-point restraints was that it prevented Goguen from being able to reach the keyboard on the cart.  (Motion at 7.)

treatment of Goguen on November 6, 2011.  These various measures, in combination, were sufficiently adverse to chill a reasonably hardy detainee's exercise of first amendment rights.

### 13.    Conspiracy

Goguen's final claim asserts that there was a conspiracy among all of the defendants to deprive him of his constitutional rights.  (Second Amended Complaint ¶ 336.)  "A civil rights conspiracy as commonly defined is 'a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damages.'"  Earle v. Benoit, 850 F.2d 836, 844 (1st Cir. 1988) (quoting Hampton v. Hanrahan, 600 F.2d 600, 620-21 (7th Cir. 1979)).  "[F]or a conspiracy to be actionable under section 1983 the plaintiff has to prove that "there [has] been, besides the agreement, an actual deprivation of a right secured by the Constitution and laws."  Landrigan v. City of Warwick, 628 F.2d 736, 742 (1st Cir. 1980).  Viewed in the light most favorable to Goguen, the overall facts and circumstances would permit a finding of concerted action sufficient to infer an agreement among some of the defendants to deprive Goguen of his rights, coupled with an actual deprivation.  However, the facts are not sufficient to justify a finding that the alleged conspiracy extended beyond the particular defendants who are subject to the two core claims.  In other words, the facts developed for purposes of summary judgment do not warrant sweeping Crafts, Hayden, Maguire, Swope, or Jeffrey Jacques into the pool of defendants based on participation in a conspiracy.  Moreover, the only thing that would keep Kelly in this case is the unsanitary cell episode, which was not exhausted administratively.

**B.      Exhaustion of Administrative Remedies**

In the foregoing discussion, I have explained why I conclude that the record raises a genuine issue of material fact concerning both a due process claim of prehearing punishment imposed on a pretrial detainee and a first amendment retaliation claim.

The defendants argue that Goguen cannot maintain any claim pertaining to the seizure of unique property (the picture), unsanitary food, being housed in an unsanitary cell, the opening of legal mail outside his presence, and being disciplined for the October 3, 2011, incident involving coffee, because he has not exhausted his administrative remedies under the Prison Litigation Reform Act (PLRA).  (Motion at 30.)  The only condition in this list that pertains to the claims that would survive the defendants' motion, if this recommended decision is adopted, is the unsanitary cell condition.  The defendants conceive of this incident as a free-standing claim (that is also how Goguen presents it in his list of claims at the end of his complaint).  The reason why it is not exhausted, according to the defendants, is that Goguen did not include the condition in his November 27, 2011, letter-grievance to the Maine Department of Corrections.

According to the defendants, pursuing a grievance with the Department is the final administrative procedure required in order for a prisoner to exhaust administrative remedies.  (Statement ¶ 220.)  The policy states:

> Inmates have unrestricted access to file alleged complaints of non-compliance with mandatory standards against the facility with the Maine Department of Corrections, Inspections Division, when a condition or issue is not resolved through the facility grievance process.

(Policy 11.3, § A.4, ECF PageID # 1131.)  Thereafter, the policy outlines that the jail's internal grievance process has only two steps, an "informal request" (level 1) and an "administrative grievance" (level 2).  (Id. § B, C.)  Under this policy, the "unrestricted access to file" a grievance with the Department after exhausting the two levels of the internal jail process amounts to an

"available" administrative remedy under the PLRA.  Cf. Johnson v. Thyng, 369 Fed. App'x 144, 147 (1st Cir. 2010) (Per Curiam) (discussing similar New Hampshire procedures).

> Pursuant to the PLRA:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

> Beyond doubt, Congress enacted § 1997e(a) to reduce the quantity and improve the quality of prisoner suits;  to this purpose, Congress afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.  In some instances, corrective action taken in response to an inmate's grievance might improve prison administration and satisfy the inmate, thereby obviating the need for litigation.  In other instances, the internal review might filter out some frivolous claims.  And for cases ultimately brought to court, adjudication could be facilitated by an administrative record that clarifies the contours of the controversy.

Porter v. Nussle, 534 U.S. 516, 524-25 (2002) (citations and quotations omitted).  Exhaustion of available administrative remedies is mandatory and applies to "all inmate suits about prison life, whether they involve general circumstances or particular episodes."  Id. at 532.  The inability of the jail to provide the requested relief does not excuse a prisoner from administrative exhaustion prior to filing suit in court.  Booth v. Churner, 532 U.S. 731, 735 (2001).  There is no futility exception and there is no opportunity for stay of the litigation pending final exhaustion.  Medina-Claudio v. Rodriguez-Mateo, 292 F.3d 31, 35-36 (1st Cir. 2002).  Dismissal of the unexhausted claims is the required ruling.  Jones v. Bock, 549 U.S. 199, 219-224 (2007).

Based on my review of Goguen's grievance letter to the Department, Goguen failed to exhaust his claim concerning the unsanitary cell assignment.  Consequently, that "particular episode" cannot form a part of this action.  Nussle, 534 U.S. at 532.

**C.      Which Defendants Remain?**

Based on my review of the summary judgment statements and portions of Goguen's

deposition, Goguen fails to develop either of his two claims against Brown, Crafts, Hayden,

Maguire, Swope, or Jeffrey Jacques.

As for the due process claim, I conclude that there is sufficient evidence to raise a

genuine issue concerning those officers who either supported or directed the imposition of

administrative segregation on Goguen prior to completion of the due process procedures outlined

in Wolff v. McDonnell and against those officers who actually conducted or ordered Goguen to

comply with the strip search and visual body cavity search process while Goguen was subject to

so-called "administrative" segregation.  Based on my review, the appropriate defendants are

Allen, Almeida, Bugbee, French, Gilblair, Meunier, Plourd, and Rizzo.

As for the retaliation claim, I conclude that there is a genuine issue concerning those

officers who supported or directed the imposition of administrative segregation on Goguen prior

to completion of the due process procedures outlined in Wolff v. McDonnell, and the cumulative

impact of disrupting court conferences, scattering legal papers throughout Goguen's cell,

imposing four-point shackles when Goguen accessed the library cart, and using unnecessary

force.  This claim is viable against Allen, Almeida, Bugbee, Gilblair, Kelly, Meunier, Plourd,

and Rizzo.

These same defendants are also subject to the conspiracy claim.

**D.      Qualified Immunity**

The defendants assert that they are entitled to qualified immunity against any claim that is

based on strip searching inmates housed in segregation.  (Motion at 25-27.)  My recommendation

that the due process and retaliation claims go forward is premised in large measure on the

imposition of multiple daily strip searches and visual body cavity searches on a pretrial detainee in advance of Wolff v. McDonnell process, so the defendants' invocation of qualified immunity with respect to their strip search practices in A-pod requires discussion.

Qualified immunity protects government actors "who could not reasonably have predicted that their actions would abridge the rights of others, even though, at the end of the day, those officials may have engaged in rights-violating conduct." Camilo-Robles v. Zapata, 175 F.3d 41, 43 (1st Cir. 1999). I have already explained why I find a genuine issue on the question of whether the plaintiff has made out a violation of constitutional rights. The remaining issue is whether the rights in question were clearly established, based on a context-specific assessment. Drumgold v. Callahan, 707 F.3d 28, 42 (1st Cir. 2013); Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (per curiam).

The defendants cite authority, including Arruda v. Fair, 710 F.2d 886 (1st Cir. 1983), supportive of the proposition that it is de rigueur to strip search inmates upon leaving or entering a segregation unit. (Motion at 26.) The cases do reflect that the use of such searches is permitted in the context of introduction to a facility, or transfer to segregated confinement, or upon return from contact visits. Bell v. Wolfish itself supports the point as even pretrial detainees were subject to a facility-wide policy of imposing strip searches following contact visits. The difference in this case, however, is that the issue concerns compliance with the Wolff v. McDonnell due process requirements before transferring a pretrial detainee in general population to punitive conditions in segregated confinement. A change in conditions that imposes multiple daily strip- and visual body cavity searches as the price of any out-of-cell liberty can reasonably be deemed punitive in comparison to the conditions of prison life existing in general population. The right of a pretrial detainee to receive due process prior to the

imposition of prison-based punishment has been clearly established since the 1970s decisions in

Wolff v. McDonnell and Bell v. Wolfish.  Consequently, I recommend that the court not

recognize qualified immunity in this particular context.[13]

**E.      Summary Judgment for Plaintiff**

The defendants' factual statement establishes that *all* inmates housed in administrative

segregation (including pretrial detainees awaiting a hearing on disciplinary charges) are strip

searched and subjected to visual body cavity searches upon every entry into and exit from a cell,

for any activity, including for mandatory daily cell searches.  The defendants' factual statement

establishes that Goguen was subjected to these conditions promptly upon a charge of violating a

prison rule, even for an insignificant violation, with no pre-deprivation process other than a

written notice naming the charge.  However, Goguen's motion for summary judgment, filed on

March 15, 2013, was untimely under the court's scheduling order.  (See docket text entry for

July 26, 2012, setting the motions deadline at October 22, 2012.)  Moreover, Goguen did not

actually file a proper motion for summary judgment but merely requested summary judgment in

connection with opposing the defendants' motion.  For these reasons, I recommend that the court

not award summary judgment to Goguen.  Additionally, I have determined that the punitive

character of administrative segregation is a question of fact to be resolved by the factfinder, so

even if Goguen's summary judgment papers had been in order, he would not be entitled to

judgment as a matter of law.  I am simply recommending that as a matter of law the undisputed

conditions of prehearing administrative segregation as implemented by the Somerset County Jail

could support a factual finding of either a due process violation or a retaliation claim, or both.

---

[13]      The defendants do not argue that qualified immunity would exist if there is a genuine issue whether they subjected Goguen to punishment in retaliation for his petition activity.

**F.      Requests for Injunctive Relief**

Although the defendants do not address Goguen's claims for injunctive relief in their summary judgment motion, there are certain requests that are not viable.  The requests are found at pages 55 and 56 of the second amended complaint.  I can discern no basis in the Constitution or in federal law for this court to order Somerset County or its jail administrators to:  restore a basketball hoop and tower of power;  provide maximum security inmates greater commissary privileges than inmates under disciplinary segregation;  expand out-of-cell time for maximum security inmates;  install cameras in the maximum security blocks;  enforce the internal grievance policy and procedure;  create pod bulletin boards related to law library books and cart options;  or create a manual to help inmates better understand how to use the law library cart.

CONCLUSION

A genuine issue exists in this case whether Defendants Allen, Almeida, Bugbee, French, Gilblair, Kelly, Meunier, Plourd, and Rizzo violated the plaintiff's right as a pretrial detainee to be free from punitive conditions of confinement without the benefit of certain predeprivation procedures.  A genuine issue also exists whether Defendants Allen, Almeida, Bugbee, Gilblair, Kelly, Meunier, Plourd, and Rizzo retaliated against Goguen's exercise of first amendment rights.  However, the following defendants are entitled to a dismissal of the claims against them, based on shortcomings in the summary judgment record:  Theresa Brown, Gary Crafts,[14] Julie Hayden, Shawn Maguire, Corey Swope, and Jeffrey Jacques.

---

[14]      Gary Crafts oversaw the disciplinary process at Somerset County Jail, which would ordinarily make him a suitable defendant.  However, the facts do not indicate that he established policy with respect to the conditions of "administrative" segregation or that he ordered Goguen to segregation or presented evidence in support of segregation.  There is an appearance that Crafts may unduly restrict the availability of witness statements (let alone the presence of witnesses), but this aspect of Goguen's claim is not adequately developed in the summary judgment record except in certain unsworn statements offered in Goguen's pleadings.

Based on these proposed findings, I recommend that the court GRANT, IN PART, the

Defendants' Motion for Judgment on the Pleadings and for Summary Judgment (ECF No. 44)

and DENY Plaintiff's Cross-Motion for Summary Judgment (ECF No. 55.)  Plaintiff's Motion to

Amend Response to Motion for Summary Judgment (ECF No. 62) is DENIED.

NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof.  A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

June 20, 2013                                /s/ Margaret J. Kravchuk
                                                    U.S. Magistrate Judge